The STATE of Ohio, Appellee,

v.

ROGAN, Appellant.

[Cite as *State v. Rogan* (1994), 94 Ohio App.3d 140.]

Court of Appeals of Ohio,
Champaign County.

No. 93–CA–11.

Decided March 30, 1994.

*Darrell L. Heckman,* Champaign County Prosecuting Attorney, for appellee.
*Robert M. Strapp,* for appellant.

---

FREDERICK N. YOUNG, Judge.

Hershel Earl Rogan III ("appellant") appeals from his conviction on two counts of trafficking in drugs, R.C. 2925.03(A)(1). He brings to us only one assignment of error:

"The trial court erred in admitting into evidence State's Exhibit 7, a transcript of tape recordings prepared by a police officer."

Our discussion of the facts of the case and the course of the trial shall therefore be generally limited to matters which are relevant to that single issue on this appeal.

I

The appellant was indicted in November 1992 on four counts of trafficking in drugs. Each count involved crack cocaine and contained a specification of a prior conviction of a felony drug abuse offense. The first count alleged the commission of a felony drug offense on October 14, 1992, and the second and third counts alleged commission of the same offense on the succeeding days of October 15 and 16, 1992. These three alleged offenses were secretly recorded by the police from the transmission from a body wire worn by the alleged purchaser of the drugs,

Glen Otway ("Otway"), known in law enforcement parlance as a "confidential informant."

The fourth count alleged that a drug trafficking felony occurred on June 26, 1992. The alleged purchaser then was not Otway but a professional undercover police operative. An attempt was made to tape this encounter as well, but the tape was deemed to be of such poor quality that it was never offered into evidence by the prosecution.

Counts one, two and three allege all of the drug trafficking occurred at the same location, the Douglas Hotel, in downtown Urbana, Champaign County, Ohio. Count four alleged that the undercover drug buy was at the Sixty–Eight Motel in Urbana, Champaign County, Ohio.

Otway was a Florida resident who had moved to Urbana for the purpose of obtaining a job and was there during the time of the alleged drug activity. Shortly after his confidential-informant work with the police, he returned to Florida and then came back for the trial, which was held in February 1993, in the Champaign County Court of Common Pleas. He testified as to the three transactions that allegedly occurred in the Douglas Hotel in Urbana. He admitted that he had not listened to the tape himself, but he had read the transcript of the tape before testifying. He further testified that in all three occasions, covered by counts one through three, his voice and that of the appellant's were recorded by Officers Purinton and Sergeant Kimpel, both officers of the Urbana Police Department. Both officers testified that they heard the voices of Otway and the appellant during the transmission from the body wire. Sgt. Kimpel knew the appellant from previous experience and recognized his voice. Both officers authenticated the tape during their testimony.

Officer Purinton testified that he made a typed transcript of the tape. The transcript was marked as State's Exhibit 7. At that point, counsel for the appellant objected to the use of the transcript by the prosecution on two grounds, to wit: (1) that the officer who transcribed the tape is not an expert in transcribing tapes, and (2) that the tape itself was the best evidence. The objection was overruled.

The transcript is titled as follows:

"BELOW IS A NONPROFESSIONAL TRANSCRIBED REPORT OF A BUY TAPE BETWEEN HERSHEL E. ROGAN III AND AN URBANA POLICE DEPT. CONFIDENTIAL INFORMANT."

On the witness stand, the officer frankly admitted that he was not a professional at transcribing audio tapes, but he swore under oath that the transcript was a true and accurate record of the tape. He stated it took him five to six hours to transcribe it and described the process he went through as follows:

"A. This transcribed report, went into detail, sit down at a desk, with a pen and piece of paper and listened to the full entire tape. That means, if I missed a part, I go back and relisten to the same part of the tape over and over and over again until I believe I have the proper recording, wording, then.

"Q. In fact, it's difficult to hear the tape if you are just trying to listen through it straight through, isn't it?

"A. That's correct.

"Q. Let's talk about the—let's talk about the tape itself in front of you, State's Exhibit 6 marked for identification purposes. Can you identify what that is? It's to the right.

"A. Oh, this?

"Q. Yes.

"A. This is a microcassette that we use in our recording which is attached to our body wire that we use to tape our undercover operation.

"Q. Was this the tape that was used in the Hershel Rogan investigation?

"A. Yes, sir. It was."

Officer Purinton was then asked by the prosecution to read from the transcript with regard to the alleged cocaine buy on October 14, 1992. He did, but when the prosecution directed him to do the same thing for the alleged transaction on October 15, the trial court interrupted and the following dialogue ensued:

"Q. I want to ask you to look on State's Exhibit 7 again.

"THE COURT: Counsel, approach the bench, please.

"BENCH CONFERENCE.

"THE COURT: Testimony will not be permitted by this witness of the transcript. The Court shouldn't have allowed it before. It sneaked in. I didn't stop it in advance. I have authorized the marking of the exhibit and the exhibit can be offered for evidence, but this witness will not read what he says took place of the conversation. He can utilize his memory—

"MR. SELVAGGIO: Okay.

"THE COURT:—of the situation. So we have the awkward situation that defense counsel can cross-examine as to the first situation, because the court *erroneously* allowed that testimony, but you can cross-examine by using the same document that he read. Your cross-examination as to the subsequent one is limited to what he testified to, and he is not using that document as his testimony. He is not going to be allowed to read it.

"MR. STRAPP: But I can't cross-examine him on what he did read?

"THE COURT: Yes, because I allowed it in.

"MR. SELVAGGIO: On the specific statements that he read?

"THE COURT: Just like the Court's ruling that you couldn't go back beyond—beyond what you did. I made the mistake. Okay." (Emphasis added.)

As to the second count of the indictment regarding the events of October 15, Officer Purinton conceded that no buy had taken place and, in fact, the transcript in regard to that transaction is headed with the date of October 15, 1992, followed by, in parenthesis, "offer to sell."

The prosecution then turned to the events of October 16 (Count III) and Officer Purinton testified, in part, as follows:

"A. I heard conversation between Mr. Rogan and Mr. Otway. There was discussion on whether or not—It was when the transaction began, whether or not the crack that was being sold was real or not. Our CI stated that it tasted like baking soda, and the defendant stated that, Well [*sic*], it's supposed to taste that way because they use that in the mixture."

As to that part of the transaction on October 16, the transcript of the tape reads as follows ("C.I." is confidential informant and "H.R." refers to the appellant):

"C.I. You're going down to get more tonight. Huh? Are they real?

"H.R. It's real. It tastes weird, don't it?

"C.I. Yea.

"H.R. (Not understandable)

"C.I. It tastes like baking soda man.

"H.R. Because they put so much in [of?] it in every rock.

"C.I. It doesn't taste real." (State's Exhibit 7, at 6.)

At the end of the transcript (State's Exhibit 7), the following appears above the signature of Officer John K. Purinton:

"THIS IS NOT A PROFESSIONAL TRANSCRIBED REPORT OF THE CONTENTS OF THE BUY TAPE CONCERNING HERSHEL E. ROGAN III. HOWEVER, THE CONVERSATION TRANSCRIBED IS A TRUE AND AC-CURATE RECORD OF THE CONTENTS OF THE BUY TAPE." *Id.* at 7.

Police officers then testified as to the alleged buy of crack cocaine on June 26 (Count IV). As stated earlier, the purchaser of the contraband drug in this case was not Otway but was an undercover agent of the Logan County Sheriff's Department, Tony Robinson. The confidential informant in this transaction was one Mike Asterino, who testified that he set up the drug deal and introduced

Deputy Robinson to the appellant in a motel room at the Sixty–Eight Motel in Urbana. The police attempted to tape this transaction also, but admitted that the tape was "not legible," and it was never introduced by the state.

Asterino testified that he was a witness to the drug transaction on June 26.

After the state closed its case, counsel for the appellant presented an active defense, which included putting appellant himself on the witness stand. The appellant admitted a prior conviction for selling cocaine in the same county and admitted that he knew Otway and had been in Otway's room in the Douglas Inn on the dates of October 14, 15, and 16, 1992, but absolutely denied under oath that he had ever sold or offered to sell crack cocaine to Otway. He also directly denied that he had sold any crack cocaine to Officer Robinson and claimed that he had never seen Officer Robinson before the trial. Under cross-examination, appellant admitted that "there was a discussion about cocaine" on October 14 and also on October 15, and further admitted that on October 16, "there was more than a discussion."

After the close of the presentation of evidence by both parties, the trial court called for a brief recess and excused the jury. The court discussed with both counsel his anticipated instructions to the jury and their closing arguments. The discussion closed with the following rulings by the court about the exhibits, out of the presence of the jury:

"THE COURT: Thank you. Discussion was held about the exhibits. The State offered Exhibits 1 through 7. The defense did not object to Exhibits 1 through 6. The defense objected to Exhibit 7. Exhibits 1 through 6 are admitted without objection. Exhibit 7 is admitted over objection.

"Exhibit 7 is a transcript of the tape recording. The Court, in providing counsel thinking on this matter, the Court believes that the transcript is an aid to listening to the tape; it does not take the place of the tape. Counsel can comment in arguments, if they wish, that it's a matter for the jury to decide what the transcript says and what the tape says, and so to—to resolve differences, if they believe differences exist."

The statement quoted above by the court that the transcript is an aid to listening to the tape and does not take the place of the tape is what is known as a cautionary instruction and will be discussed subsequently. This statement was made, however, only in the presence of counsel. The transcript does not indicate that the court ever advised the jury in his instructions as to the transcript being only an aid to listening to the tape and not taking the place of the tape.

The state, in its closing arguments, discussed the tape and the transcript as follows:

"I told you at the start that this case is not about whether a tape was used. In fact, in most of our crimes in the United States there aren't any audio or visual recordings, and most of our convictions in the criminal justice system, they are not based on audio or visual recordings. It's usually based on eyewitnesses.

"I told you from the start that the tape should be used as a supplement. I encourage you to review the tape when you go back there. In fact, the transcript will be back there. I caution you to decide how much weight you should give the transcript. Take your time with the tape. For many of you, this may be the first time that you have ever seen crack cocaine. Take the cocaine out of—of the bag and take a look at it. Listen carefully, if you wish, to the the [*sic*] tape. *Look carefully at the transcript. Give it the weight that you think it deserves.*

"But the thing I ask you to give the most weight to is the testimony of our witnesses." (Emphasis added.)

The defense counsel in his closing argument also referred to the tape and the transcript:

"Yes, there is a tape of these events in the Douglas hotel, and I encourage you to listen to the tape and I encourage you to determine what's on the tape, not relying on the nonprofessional transcription made by Officer Purinton, a transcription that was not made by a professional court reporter. Don't you wonder why it was not done that way?"

During his instructions to the jury, the court advised them that evidence is "all the testimony received from the witnesses" and "the exhibits admitted during the trial * * *." The court also advised the jury that direct evidence includes exhibits submitted as evidence during the trial. The court also advised the jury, properly, that evidence does not include the opening statements or the closing arguments of counsel and that they, the jury, are to determine "what weight, if any, the exhibits should receive in the light of all the evidence." There was no particularized cautionary instruction relating to the transcript itself.

The transcript and the tape, together with a miniature player suited to playing that tape, went with the jury to the jury room when they retired for their deliberations. The jury subsequently returned a verdict which found the appellant not guilty on Counts I and II, but guilty on Counts III and IV. The defendant was sentenced on February 26, 1993, to incarceration for not less than four nor more than fifteen years on both Counts III and IV and the sentences were made consecutive, so the total confinement of the appellant would be not less than eight nor more than thirty years. A mandatory fine of $3,000 for each count was not imposed, as the court found the appellant indigent.

It is from these two convictions that the appellant brings us his appeal, citing as error only the admission into evidence of State's Exhibit 7, the transcript of the tape recordings.

## II

While the issue before us is the admission into evidence of a transcript of a tape recording, that issue can ordinarily not be reached unless the tape recording itself is first admitted into evidence. Evid.R. 1002, the "best evidence rule," cited by the appellant here and at trial in objecting to the admission of the transcript, provides:

"To prove the content of a writing, *recording*, or photograph, *the original* writing, *recording*, or photograph *is required*, except as otherwise provided in these rules or by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio." (Emphasis added.)

Tape recordings themselves are the best evidence of their contents, not any transcript prepared from them. *State v. Holmes* (1987), 36 Ohio App.3d 44, 521 N.E.2d 479. This court has already indicated that it would not favor the admission of a transcript without first duly admitting the tape recording from which the transcript was allegedly made. *State v. Susser* (Dec. 5, 1990), Montgomery App. No. 11787, unreported, 1990 WL 197958.

The approved procedure in Ohio for determining the admissibility of a tape recording has been set forth by the Court of Appeals for Lorain County in *State v. Gotsis* (1984), 13 Ohio App.3d 282, 283, 13 OBR 346, 347–348, 469 N.E.2d 548, 551, which held:

"In order to be admissible, audio recordings must be authentic, accurate and trustworthy. *United States v. Mitchell* (C.A.D.C.1976), 559 F.2d 31, certiorari denied (1977), 431 U.S. 933 [97 S.Ct. 2641, 53 L.Ed.2d 250]; and *United States v. Slade* (C.A.D.C.1980), 627 F.2d 293. Admission into evidence of tape recordings containing inaudible portions is a matter within the sound discretion of the trial court. *United States v. Williams* (C.A.8, 1977), 548 F.2d 228; and *United States v. Skillman* (C.A.8, 1971), 442 F.2d 542, certiorari denied (1971), 404 U.S. 833 [92 S.Ct. 82, 30 L.Ed.2d 63]. In determining whether to admit tape recordings, the trial court must assess whether the unintelligible portions are so substantial as to render the recordings as a whole untrustworthy. *United States v. Bell* (C.A.8, 1981), 651 F.2d 1255; and *United States v. Young* (C.A.8, 1973), 488 F.2d 1211.

"In the instant case, the state presented extensive testimony as to the recording and subsequent custody of all the tapes. Defendant presented nothing to indicate that the recording had in any way been altered. Further, the MEG agents who recorded the conversations testified as to the content of the conversa-

tion before each tape was played. After playing each tape, the agent explained the sources of various background noises thereby clarifying any problems caused by poor quality. The defendant had the opportunity to cross-examine the agents concerning the testimony as well as the opportunity to offer his version of the inaudible portions so as to clear up any ambiguities that the recording may have raised. The tapes were clearly relevant in corroborating the agents' testimony. Under these circumstances, we find no abuse of discretion."

■■■■ If significant portions of the tape are deemed inaudible by the trial court after listening to same, the court can still allow the admission of the audible portions, in its discretion, if the same have evidentiary value in the case before the court.

The *Gotsis* court was only following well-established law, which apparently was first enunciated by the United States Court of Appeals for the District of Columbia Circuit, which held as follows:

"No all embracing rule on admissibility should flow from partial inaudibility or incompleteness. The Court of Appeals for the Third Circuit, in *United States v. Schanerman*, 150 F.2d 941, 944, has said that partial inaudibility is no more valid reason for excluding recorded conversations than the failure of a personal witness to overhear all of a conversation should exclude his testimony as to those parts he did hear. Unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy the recording is admissible, and the decision should be left to the sound discretion of the trial judge. This is especially so when the witness who heard the statements recorded also testifies, so that the recordings give independent support to his testimony. *Wright v. State* [38] Ala.App. [64], 79 So.2d 66; *State v. Slater, supra* [36 Wash.2d 357, 218 P.2d 329]. Here the trial judge followed the correct procedure of having the records played out of the presence of the jury so that she could rule on any objections raised by defendants before the jury heard the recordings. See *Wright v. State, supra,* 79 So.2d at page 73. We have no basis for finding an abuse of discretion by the District Court in not deciding that the recordings were too incoherent, inaudible or partial to be admitted." *Monroe v. United States* (C.A.D.C.1956), 234 F.2d 49, 54–55. See, also, *United States v. Weiser* (C.A.2, 1969), 428 F.2d 932; *United States v. Kaufer* (C.A.2, 1967), 387 F.2d 17; *Addison v. United States* (C.A.5, 1963), 317 F.2d 808, certiorari denied (1964), 376 U.S. 905, 84 S.Ct. 658, 11 L.Ed.2d 605 (fifty percent inaudible); and *United States v. Hall* (C.A.4, 1965), 342 F.2d 849, certiorari denied (1965), 382 U.S. 812, 86 S.Ct. 28, 15 L.Ed.2d 60 (twenty-five percent inaudible).

Thus, it is settled law that the issue of the admission of a tape recording itself is within the sound discretion of the trial court.

In a few limited situations, transcripts of tapes can be admitted into evidence without the admission of the tapes themselves. Under Evid.R. 1004, a transcript of a recording is admissible if:

"(1) *Originals Lost or Destroyed.* All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith; or

"(2) *Original not Obtainable.* No original can be obtained by any available judicial process or procedure; or

"(3) *Original in Possession of Opponent.* At a time when an original was under the control of the party against whom offered, he was put on notice, by the pleadings or otherwise, that the contents would be subject of proof at the hearing, and he does not produce the original at the hearing; or

"(4) *Collateral Matters.* The writing, recording, or photograph is not closely related to a controlling issue."

Application of the first subsection of that rule has not been an unusual occurrence by courts in a number of states. See, *e.g., State v. Strothers* (Mo.App.1990), 798 S.W.2d 723, where a transcript was held not admissible in lieu of the tape when the tape was in existence, but the state had neglected to obtain it from a locked safe in time for the trial. See, also, *State v. Snyder* (Mo.App. 1988), 748 S.W.2d 781 (transcript admissible since tape was innocently destroyed and accuracy of transcript was established by testimony); and *State v. Joe* (La.App.1987), 502 So.2d 270.

These situations have generally arisen in the past, where a transcript or a re-recording is made from a tape used constantly in the field over and over again, and which is routinely erased after it has been transcribed or re-recorded. It is unlikely, but possible, that law enforcement officials today, who are much more sophisticated in such matters, would not retain the original of a tape recording.

Sometimes an official record or a business record can be itself a tape recording and its contents may be held admissible by other evidence, such as possibly a transcript. See Evid.R. 1005 and *State v. Rainey* (1983), 233 Kan. 13, 660 P.2d 544.

Special consideration must also be given to transcripts where the conversation recorded on the tapes is in a foreign language. See, *e.g., United States v. Cruz* (C.A.11, 1985), 765 F.2d 1020; *United States v. Rengifo* (C.A.1, 1986), 789 F.2d 975; and *United States v. Briscoe* (C.A.7, 1990), 896 F.2d 1476.

■ In the case *sub judice,* there is no record that the trial court listened to the tape to determine its intelligibility in order to determine, in its discretion, its admissibility. We have listened to the tape, as we were invited to by the state in its brief, and have found it to be of extremely poor quality. There are portions

that are virtually inaudible, conversations that are garbled, and words that are unintelligible. Had we been in the position of listening to the tape to determine its admissibility, we might not have allowed it into evidence. However, it was within the discretion of the trial court to allow the tape into evidence as corroboration for some of the testimony elicited at the trial. In any case, the appellant assigns no error here and we find none.

### III

The issue of the admissibility of transcripts into evidence has surfaced in Ohio, as near as we can determine, in only seven cases, despite its apparent widespread use in criminal, and even some civil, cases. The first instance was a case in this court itself, where the admission of a taped record of a conversation was the issue and it was allowed in as evidence. *State v. James* (1974), 41 Ohio App.2d 248, 70 O.O.2d 456, 325 N.E.2d 267. The opinion noted that a written transcript of the tape recording was also introduced into evidence, but no objection had been made to it and it was not an issue on appeal. *Id.* While that early decision did not actually reach the issue at hand, our inquiry nevertheless will be governed by the seminal closing remarks of that opinion, to wit:

"The rules of evidence regarding admission and exclusion, including the rule requiring the production of the best evidence, are founded basically upon considerations of truth and reliability." *Id.* at 250, 70 O.O.2d at 457, 325 N.E.2d at 269.

The issue finally surfaced in full for the first time in 1982 in *Harleysville Mut. Ins. Co. v. Santora* (1982), 3 Ohio App.3d 257, 3 OBR 289, 444 N.E.2d 1076, where the Cuyahoga County Court of Appeals squarely held a transcript to be totally inadmissible. After noting that the original recording had also been received into evidence, the court there stated the issue seemed to be one of first impression in Ohio. It recognized that *James* had not addressed the issue. The court stated that:

"Cases from other jurisdictions reveal at least two viewpoints on the issue. One is that transcripts could be admitted as a listening aid provided their accuracy was not questioned, *United States v. Turner* (C.A.9, 1975), 528 F.2d 143, 167; *People v. Feld* (1953), 305 N.Y. 322, 331–332, 113 N.E.2d 440, 444. The other is that the admission of a transcript when the original recording is available violates the best evidence rule and is reversible error, *Bonicelli v. State* (Okla. Crim.App.1959), 339 P.2d 1063, 1065; *Duggan v. State* (Fla.App.1966), 189 So.2d 890, 891." *Harleysville, supra,* 3 Ohio App.3d at 260, 3 OBR at 293, 444 N.E.2d at 1080.

The court then pointed out that in both *Turner* and *Feld* the jury was allowed to use the transcript only as a listening aid while the tapes were being played. The transcripts did not go to the jury room. In *Bonicelli* and *Duggan,* objections to admission of the transcripts had been based not only on violation of the best evidence rule but also rules against hearsay, undue repetition, and improper emphasis. The court in *Harleysville* found the situation before it very much like the *Bonicelli* and the *Duggan* cases because the transcripts were admitted fully into evidence and their use was not limited just as listening aids as was the situation in *Turner* and *Feld.* There also existed a clear question as to accuracy of the transcript, which did not seem to contain an audible statement that both the trial judge and the court of appeals heard in listening to the recording. The court then held that the admission of the written transcript was reversible error, stating that:

" * * * The transcript should not have been admitted because it was secondary evidence. Moreover, it could not capture or preserve nuance, voice tone, emphasis, evasion, faltering, or emotion. This underwrites the status of the transcript as *not* the best evidence of the conversation between Bawroski and the defendant.

"This 'not the best' status was reinforced by the admitted flaws in the transcription." (Emphasis *sic.*) *Harleysville, supra,* at 261, 3 OBR at 294, 444 N.E.2d at 1081.

The issue next surfaced in 1985 in *State v. Blankenship* (May 22, 1985), Medina App. No. 2050, unreported, 1985 WL 10768, where the court of appeals stated the use of transcripts as "listening aids" was well established, citing *Turner,* as had the court in *Harleysville.* The court then found it was appropriate, in the sound discretion of the trial judge, to furnish the jury with copies of a transcript while they listened to the tape in open court.

The Franklin County Court of Appeals next dealt with the issue in 1987 in *State v. Holmes, supra.* The court contrasted the holding in *Harleysville* with the holding in *Blankenship.* The court then pointed out that the *Blankenship* court relied on *Turner, supra,* and that:

" * * * In *Turner,* the appellate court was influenced by the procedural safeguards adopted by the trial court, including the methodical review of the tapes and transcripts in defense counsel's presence, the marking of corrections on the transcripts, and the eventual stipulation by all counsel that the transcripts were an accurate rendition of the tapes. *Id.* [528 F.2d] at 167.

"The trial court herein did not follow the procedural safeguards emphasized by the *Turner* court, although defense counsel was given access to the tapes and transcripts with an opportunity to point out any differences. A problem with the record is that the court reporter's version of the tapes played in the court room is

almost unintelligible. Apparently, the court reporter was not given earphones as was the jury who presumably heard the tapes better. However, in light of the fact that appellant is unable to point out any material differences between the tapes and the transcript supplied to the jury as listening aids, there was no *prejudicial* error. The use of a typed transcript as a visual aid to the jury in listening to the playback of the recorded communication is a matter within the sound discretion of the trial court. *United States v. John* (C.A.8, 1975), 508 F.2d 1134, 1140–1141. *Only the tapes were sent to the jury room. The written transcripts were used only as listening aids.*" (Emphasis added.) *Holmes, supra,* 36 Ohio App.3d at 50, 521 N.E.2d at 486.

The court in *Holmes* seems to have said that the trial court did in fact commit error in not following the careful procedures which had been followed in *Turner,* but it was simply not prejudicial because the defendant was not able to attack the accuracy of the transcript. As stated earlier, this court has cited *Holmes* with approval. *State v. Susser, supra.*

We note, in passing, that the Court of Appeals for Sandusky County had the opportunity to join the discussion of the issue in *State v. Crawford* (1989), 60 Ohio App.3d 61, 573 N.E.2d 784, where it had before it an objection based on the best evidence rule to the admission of a written transcript of a criminal defendant's videotaped statement. The court, however, ruled that since the objection at the trial to the admission of the transcript had been based on the question of its accuracy, the defendant had waived any objection based upon the best evidence rule, and so the court refused to consider the issue.

Finally, apparently, the last word in Ohio on the subject comes from the Supreme Court of Ohio in *State v. Waddy* (1992), 63 Ohio St.3d 424, 445–446, 588 N.E.2d 819, 835–836, where, during trial, the court apparently allowed the jury to use transcripts of taped conversations as a listening aid while the tapes were being played. The Supreme Court dealt with this claimed error as follows:

"Waddy also attacks the use of transcripts to help the jurors follow the tapes. He claims this violated Evid.R. 1002, the 'best evidence' rule. However, the transcripts were not admitted into evidence, so Evid.R. 1002 is irrelevant. See Jacobs, Ohio Evidence: Objections and Responses (1989) 287–289, Section 1002–2(D).

"Moreover, Waddy conceded the transcripts' accuracy at trial. We have compared the tapes and transcripts ourselves and find the latter accurate. Where there are no 'material differences' between a tape admitted into evidence and a transcript given to the jury as a listening aid, there is no prejudicial error. *State v. Holmes* (1987), 36 Ohio App.3d 44, 50, 521 N.E.2d 479, 486. Accord *United States v. Smith* (C.A.6, 1976), 537 F.2d 862, 863–864.

"Waddy urges us to reject *Holmes* and find prejudice based on 'overemphasis or the incorrect implication caused by trying to establish something with both an original and an additional "aid." ' Waddy cites no authority for his proposed rule. More important, he does not explain how an accurate transcript could create any 'incorrect implication.' We reject his argument, and his eighth proposition of law."

In the *Smith* case cited by the Supreme Court, the Sixth Circuit Court of Appeals came down squarely behind the rule that transcripts will not be allowed' into evidence unless they have been absolutely stipulated as accurate. The court in *Smith* did not inform us whether the transcripts there went to the jury during their deliberations or were only used as an aid in listening to the tape recordings. The court, however, in *Smith* cited *United States v. Bryant* (C.A.2, 1973), 480 F.2d 785, 791, for allowing transcripts as an aid in listening to tape recordings, where the transcripts are stipulated to be accurate. In *Smith*, therefore, the Sixth Circuit seems to be recognizing that allowing a jury to follow a tape recording by the use of transcripts is, in fact, an admission of the transcripts into evidence, while the Supreme Court of Ohio in *Waddy*, by contrast, ruled that same procedure does not constitute admitting the transcripts into evidence. We are, of course, obliged to follow the view of the Supreme Court of Ohio on this issue but, regardless, we believe it is the better rule. The difference is that the use of transcripts by a jury only as listening aids is transitory and fleeting, whereas allowing transcripts into the jury room during its deliberations, which was the procedure allowed in the case *sub judice*, invests the transcripts with the elevated status of exhibit evidence, or "substitute evidence," as the United States Court of Appeals for the Fourth Circuit has termed it. See *United States v. Collazo* (C.A.4, 1984), 732 F.2d 1200, 1204.

The Supreme Court in *Waddy* seems also to go beyond *Smith* in allowing the use of transcripts as listening aids even though they have not been stipulated but where there are found to be no "material differences" between the tape admitted in evidence and the transcript used as a listening aid. Where a defendant concedes the accuracy of the transcript, as in *Waddy*, we do not believe it is necessary for any court to review the transcript with the tape. The Supreme Court in *Waddy* left open the issue whether there could be prejudicial error if there is no stipulation as to accuracy or discrepancies between the tape and transcript are argued.

Finally, we note with interest that the Supreme Court in *Waddy* rejected the idea that an accurate transcript could create any "incorrect implication." We will return to that subject later.

Based upon the cases so far in Ohio, we thus seem to have an emerging consensus that transcripts of tapes can, possibly under certain circumstances and

possibly with certain procedures enforced, be used as listening aids. There is no holding yet, however, that specifically bars the transcripts from being admitted into evidence. Since the issue does not seem to be definitively settled in Ohio, and there exists a vast array of divergent views in other jurisdictions, we find it instructive to review those decisions, and we shall turn to that next.

## IV

Cases from other jurisdictions prove that the issue of admitting a transcript into evidence has been a very troubling problem for the courts over the years and they have reacted with a broad range of decisions on the matter. See, Annotation, Admissibility in Evidence of Sound Recording as Affected by Hearsay and Best Evidence Rules (1974), 58 A.L.R.3d 598.

On one extreme, some courts have routinely admitted transcripts into evidence and allowed them to go to the jury room during the jury's deliberations once some evidence as to the accuracy of the transcripts has been received. The earliest instance we can find of this view is as far back as 1937 when a transcript of a recorded conversation in a divorce case was admitted without much discussion. *Kilpatrick v. Kilpatrick* (1937), 123 Conn. 218, 193 A. 765. See, also, *United States v. Williford* (C.A.11, 1985), 764 F.2d 1493; *United States v. Costa* (C.A.11, 1982), 691 F.2d 1358 (transcripts sent to jury but not the tapes themselves); *United States v. Carson* (C.A.2, 1972), 464 F.2d 424, certiorari denied (1972), 409 U.S. 949, 93 S.Ct. 268, 34 L.Ed.2d 219; and *Chavira Gonzales v. United States* (C.A.9, 1963), 314 F.2d 750.

On the other extreme, a number of courts have refused to allow a transcript into evidence even as an aid to the jury when a tape was played during the trial. The earliest recorded instance that we have found of this view was in 1945 where tape-recorded conversations between a bribery suspect and a draft board member were allowed to be played to the jury, but "[t]ranscribed notes, made by a stenotype operator from hearing the records repeatedly 'played', were properly excluded." *United States v. Schanerman* (C.A.3, 1945), 150 F.2d 941, 944. See, also, *Bonicelli v. State, supra; Duggan v. State, supra; State v. Alexander* (La.1976), 328 So.2d 144; and *People v. Mitchell* (1972), 40 A.D.2d 117, 338 N.Y.S.2d 313, where the appellate court retreated somewhat from a hard-line refusal to admit into evidence by ruling that the issue was within the discretion of the trial court, and defendant's counsel was properly given a copy of the transcript to use for purposes of cross-examination and as an aid while the tape was being played to the jury.

Some later decisions began to graft onto the procedure the rule that transcripts could only go to the jury room if the court gave instructions which explicitly informed the jury that the transcripts were not themselves evidence, that what

they hear on the tape is evidence, and that only the jurors are the triers of the fact and it is their senses and judgment of what they hear on the tape that controls, not what is in the transcript. See, *e.g.*, *United States v. Koska* (C.A.2, 1971), 443 F.2d 1167, at 1169, fn. 1, certiorari denied (1971), 404 U.S. 852, 92 S.Ct. 92, 30 L.Ed.2d 92; *United States v. Onori* (C.A.5, 1976), 535 F.2d 938; *United States v. Larson* (C.A.5, 1983), 722 F.2d 139; and *United States v. Rengifo* (C.A.1, 1986), 789 F.2d 975.

Some courts have allowed the transcript to go the jury room even where there are questions about the accuracy of some portions of it. These courts have suggested that in such cases the trial judge does not even have to be involved in determining the accuracy of the transcript; the judge can simply require that the defendant produce his own version of the transcript and thus both versions of a tape will be allowed to go to the jury during their deliberations. *United States v. Carson, United States v. Onori,* and *United States v. Rengifo, supra.*

The practice of requiring the defendant to submit another transcript where the defendant claims discrepancies between the transcript provided by the state and the tape recording itself has been severely criticized. See Carr, Voices, Texts, and Technology: Evidence Law Confronts Tapes and Their Transcriptions (Winter 1991), St. Louis U.L.J. 289, 312–315 ("Carr"). The author points out that such a practice can impose an onerous and expensive burden upon the defendant and, moreover, seems to be coercing the defendant into producing evidence and not simply supplying something which is already in existence but is evidentiary in nature, such as submitting blood or hair samples for analysis, being made to appear in a lineup, or submitting business records. The author states:

"The requirement that a defendant produce his own version of a transcript is also a departure from the fundamental fairness aspect of due process. The long accepted notion is that the burden of proof lies with the prosecution. Exceptions to that rule are relatively few, and those exceptions apply mostly to issues for which the defendant is justly and uniquely in a position to choose whether to raise and provide the best, if not the only, evidence.

" * * * *

"In contrast, the defendant possesses no unique knowledge of a transcript. The prosecution was probably the impetus for the tape, either through its instructions to police that consent recordings are admissible, or its involvement in the process of obtaining a wiretap order." Carr at 314–315.

Some of the cases have allowed transcripts as evidence to go to the jury room only if proper limiting instructions are given *and* only if they have been *stipulated* to be accurate. *Koska, Larson,* and *Onori, supra.*

## V

We must, at this point, ask ourselves, why all the fuss?  Why should not a jury have before it properly authenticated transcripts of tapes that have been admitted into evidence and that the jury had listened to (not the case *sub judice* ), especially if the transcripts have been stipulated to be accurate or the defendant has been unable to point to any material, prejudicial inaccuracies?

The first and obvious answer is that, as the Court of Appeals for Cuyahoga County stated in *Harleysville, supra,* 3 Ohio App.3d at 261, 3 OBR at 294, 444 N.E.2d at 1081, the transcript "could not capture or preserve nuance, voice tone, emphasis, evasion, faltering, or emotion."  We could add inflection and all the other ways the human voice can communicate different meanings of the same word or phrase.  We are all familiar with the different meanings you can communicate by using the same phrase.  Try, for instance, saying to yourself, "Oh, sure," in different ways and see how many meanings you can communicate. We need not elaborate the point.  Translating a recorded and sometimes extended and animated conversation onto a typed transcript is like taking a three dimensional, full-color view of mountains, valleys, and meadows, and flattening it into a gray, colorless sheet of paper with merely contour lines on it.  You obtain some basic information, but you certainly will not get the full flavor of it.  The short answer is that a transcript can *never* be accurate even if it is stipulated to be word for word what is heard on the tape.  In that sense, an "accurate" transcript can indeed sometimes create an "incorrect implication."  Cf. *Waddy, supra.*

A second and perhaps more subtle reason for distrusting the use of transcripts by a jury during their deliberations may be summarized as the "Gutenberg effect."  Until Johann Gutenberg invented the process of printing from moveable type in the mid–Fifteenth Century, information and reading were generally confined to a very small and quite exclusive literate class.  Information, and therefore knowledge, were not widespread, and circulated only among members of this exclusive class of clerics and professionals.  Suddenly (in historical terms) the printed word became widespread and almost universally available.  Those who could read began to share the knowledge, and therefore the power, heretofore accorded a small elite class.  This "Gutenberg effect" had real historical consequences.  For instance, it was forbidden by law in the antebellum South to teach slaves how to read.  See Douglass, Life and Times of Frederick Douglass (1966 Ed.) 44–45.  Douglass writes movingly of the "mystery" of reading and how he was starting to learn to read from the wife of his master until the master discovered what was going on.  When, as Douglass reports:

"Of course he forbade her to give me any further instruction, telling her in the first place that to do so was unlawful, as it was also unsafe; 'for,' said he, * * *

'If he learns to read the Bible it will forever unfit him to be a slave. He should know nothing but the will of his master, and learn to obey it.' " *Id.* at 44.

Douglass then writes:

" 'Very well,' thought I. 'Knowledge unfits a child to be a slave.' I instinctively assented to the proposition, and from that moment I understood the direct pathway from slavery to freedom." *Id.* at 45.

Learning to read from the printed word, and thereby acquiring the power that knowledge gives, naturally invest the printed word with a certain aura, as in the well-known phrase, "if it's in print, it's got to be true." We all know that is not truly the case, but it nevertheless is a difficult urge to resist. Courts and legal scholars have recognized the risk of prejudicing the defendant in a criminal case where transcripts of recorded conversations are allowed to be used by their jury during its deliberations. The United States Court of Appeals for the Fourth Circuit, as we have already noted, designated transcript use in such a way as "substituted evidence." *United States v. Collazo, supra,* 732 F.2d at 1204. Charles E. Carr in his law review article on the subject put it this way:

" * * * Transcripts that are worth litigating over are probably neither accurate nor inaccurate. Rather, at crucial places transcripts select from a range of possible interpretations, and the written interpretation becomes the accepted one. No matter how often a judge may assert that the recording is the best evidence and that the recording, not the transcript, controls when the two are different, it is from the transcript that the tape will be understood." Carr at 294.

As an example of a probable prejudicial effect on a defendant by the jury's use of a transcript during its deliberations, Professor Carr uses the analogy of a map to a countryside and points out that:

" * * * When matters are unclear, such as the topography between two points, one is more likely to work from the map than from one's eye to avoid hiking into a swamp. Accordingly, one would work from the transcript rather than one's ear in deciding whether a drug dealer was offering 'a nickel bag' or 'my old bag.'

"Here, one can better understand the action of the *Duggan* court and its concern over the 'highly prejudicial' impact of the transcript. In *Duggan,* the jury retained the transcript during deliberations even though the actual recordings were not provided to the jurors. Duggan contended that allowing the transcript to be used in this way was improper because the transcript became more important than the recordings. Although the court declined to decide this point because it had found that the transcript was not admissible at trial, one can easily understand how the trial court's action magnified the impact of any inaccuracies in the transcript to the point of prejudice." Carr at 295.

A further reason for disfavoring the use of a transcript by a jury during its deliberations is the heightened emphasis given the transcript by the trial court by the simple act of admitting a transcript into evidence and allowing its full use by the jury. The Court of Appeals for Cuyahoga County in *Harleysville* recognized this danger by quoting from the court in *Bonicelli:*

"As defense counsel urges, the court might as well have said: 'Here is something good, we want you to have a double dose of it so you won't overlook it. We think it's [*sic*] importance deserves extra special treatment. Hence, we do not only present the recording but in transcripted form so you won't possibly forget it and hence we place the judicial finger of approval on it by way of emphasis.'" *Id.*, 3 Ohio App.3d at 261, 3 OBR at 294, 444 N.E.2d at 1081.

In the case *sub judice*, the trial court sent the transcript, as well as the tape recording, to the jury for its use during deliberations, without any instructions which would have the effect of cautioning the jury as to what weight it would give the transcript vis-a-vis the tape recording. The court merely told the jury that it would be the judge of the weight of the evidence before it. To be sure, counsel for both the state and the appellant made comments to the jury in their closing arguments that seemed to suggest a cautionary approach by the jury in its use of the transcript, but such remarks to have any serious weight with the jury should have come from the trial court itself and, furthermore, the court cautioned the jurors that closing arguments were not evidence.

The trial court in the case *sub judice*, as we have already noted, recognized and admitted its error in allowing a witness for the state to begin reading from the transcript while testifying to the jury as to what happened on the date of the first alleged drug transaction (Count I). If it was error to allow a witness to read from the transcript, how could it not be error to send the entire transcript to the jury for it to read during its deliberations without any cautionary instructions?

Does our analysis, however, mean that because a transcript can *never* be completely accurate, and its use by a jury at any time would heighten its credibility to the point of possible prejudice against the defendant, that transcripts can never be properly used during the course of a trial? We think not.

## VI

As early as 1953, a line of authorities began to emerge that seemed to provide a middle ground between the total exclusion of transcripts and the full admission of transcripts to a jury during its deliberations, which extremes we have already discussed. In *People v. Feld, supra*, the Court of Appeals of New York approved the furnishing of copies of a transcript to the jurors while they were listening to the playing of the tape recording. The transcripts had been authenticated by an

official stenographer and the defendant did not object as to their accuracy. Furthermore, the transcripts had been compared by the court and counsel outside the presence of the jury for accuracy. The court said:

" * * * To allow the court and jurors to hold in their hands a transcript as they listened to the playback of the records was no different than allowing them to have, in an appropriate case, a photograph, a drawing, a map or a mechanical model, any of which have long been recognized as an assistance to understanding. [Citations omitted.]" *People v. Feld*, 305 N.Y. at 331–332, 113 N.E.2d at 444. See, also, *United States v. Hall* (C.A.4, 1965), 342 F.2d 849; *Fountain v. United States* (C.A.5, 1967), 384 F.2d 624; and *United States v. Kaufer, supra.*

The main concern of the courts continued to be the issue of the accuracy of the transcripts that the juries were allowed to see during the playing of tape recordings, even though they were not allowed to take the transcripts into the jury room during deliberations. The most severe rule that emerged in one line of decisions holds that transcripts cannot be used as an aid in listening to tape recordings unless they have been actually stipulated by the parties to be accurate. This is the rule that is followed in the Sixth Circuit. *United States v. Smith, supra.* In *Smith*, the Sixth Circuit cited *United States v. Bryant, supra*, as the source of the rule. *Bryant*, however, is actually the source of a more liberal rule. In that case, the trial court allowed the jury to use the transcript solely as an aid to understanding the tape while it was being played, but the transcript had not been actually stipulated as to its accuracy. The Second Circuit Court of Appeals held that while the use of the transcript without proper stipulation was indeed error, the error was cured when the trial judge instructed each juror to strike out on his copy of the transcript any statements the person did not hear when the tape was being played and the jurors were warned that the transcript might be inaccurate and not to rely heavily upon its accuracy. The trial court added the following instructions:

" 'It is the tape recorder that counts, not the transcript. The transcript was given to you in order that this might assist you in understanding the tape recorder.

" ' * * *

" 'I will ask you to just rely upon what you actually heard from the tape recorder. .

" 'If you haven't heard it from the recorder, then you disregard the transcript, if the recorder does not conform.

" 'As I said before, the transcript was given to you only to assist you in hearing the actual tape.' " *Id.*, 480 F.2d at 791.

The court emphasized the importance of these cautionary instructions by stating that:

"We are satisfied that these repeated cautionary instructions eliminated whatever harmful effect that might otherwise have resulted from any discrepancies between the tape and the transcript. See *United States v. Lawson,* 347 F.Supp. 144, 149 (E.D.Pa.1972). We hold that the judge, through his careful and emphatic instructions, cured whatever initial error may have been committed in allowing the jury to see the inaccurate transcript." *Id.,* 480 F.2d at 791.

The majority of cases that followed developed and reaffirmed the rule that it was not improper and was within the sound discretion of the trial court to allow a jury to use transcripts as visual aids while tapes are being played during the trial, provided proper cautionary instructions are given to the jury by that court and only if accuracy has been established either by testimony or by the court in chambers, or where the party objecting to such use of transcripts has failed to demonstrate any particularized inaccuracies. Typical, and often cited, is the discussion of the approved procedure by the Eighth Circuit in *United States v. McMillan* (C.A.8, 1974), 508 F.2d 101, 105–106, as follows:

" * * * The best evidence of the conversation is the tape itself; the transcript should normally be used only after the defendant has had an opportunity to verify its accuracy and then only to assist the jury as it listens to the tape. If accuracy remains an issue, a foundation may first be laid by having the person who prepared the transcripts testify that he has listened to the recordings and accurately transcribed their contents. Cf. *Fountain v. United States,* 384 F.2d 624, 632 (5th Cir.1967), cert. denied, 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968). Because the need for transcripts is generally caused by two circumstances, inaudibility of portions of the tape under the circumstances in which it will be replayed or the need to identify the speakers, see *United States v. Bryant,* 480 F.2d 785, 790–791 (2d Cir.1973); *Fountain v. United States, supra,* 384 F.2d at 632; *United States v. Hall,* 342 F.2d 849, 853 (4th Cir.), cert. denied, 382 U.S. 812, 86 S.Ct. 28, 15 L.Ed.2d 60 (1965), it may be appropriate, in the sound discretion of the trial judge, to furnish the jurors with copies of a transcript to assist them in listening to the tapes. In the ordinary case this will not be prejudicially cumulative. *Fountain v. United States, supra,* 384 F.2d at 632. Transcripts should not ordinarily be read to the jury or given independent weight. The trial judge should carefully instruct the jury that differences in meaning may be caused by such factors as the inflection in a speaker's voice or inaccuracies in the transcript and that they should, therefore, rely on what they hear rather than on what they read when there is a difference. Transcripts should not ordinarily be admitted into evidence [meaning, apparently, that they should not be allowed to go to the jury during its deliberations] unless both sides

stipulate to their accuracy and agree to their use as evidence. See *generally* 17 Am.Jur.P.O.F. Tape Recordings as Evidence §§ 54–56 (1966)." See, also, *e.g., United States v. Chiarizio* (C.A.2, 1975), 525 F.2d 289; *United States v. Turner* (C.A.9, 1975), 528 F.2d 143 (transcripts given to jurors and kept face down until playing of the tape had begun and at its end were immediately collected); *United States v. John, supra; Duncanson v. State* (1979), 181 Ind.App. 370, 391 N.E.2d 1157; and *Atkins v. State* (Del.1987), 523 A.2d 539.

The most recent cases found continue to support the majority view as to the use of transcripts as outlined above. *State v. Smart* (1993), 136 N.H. 639, 622 A.2d 1197; *State v. Swanson* (Minn.1993), 498 N.W.2d 435; *Lawson v. State* (Ind.App.1993), 619 N.E.2d 964; *Munoz v. State* (Wyo.1993), 849 P.2d 1299; *Cheely v. State* (Alaska App.1993), 861 P.2d 1168; *Leavy v. State* (1993), 314 Ark. 231, 862 S.W.2d 832.

A divergence of views still exists as to whether, in the absence of an agreement between the parties as to the accuracy of the transcript, the trial court itself should listen to the tape and follow it with a transcript in order to rule upon its accuracy (see, *e.g., Atkins v. State, supra*) or whether in the case of a challenge as to accuracy the court should require the submission of transcripts by both parties. See *United States v. Hogan* (C.A.11, 1993), 986 F.2d 1364, where the court stated at 1376:

"Since the jury must always reconcile the discrepancies in the transcript(s) against the recording itself, the district court need not listen to the tape or decide whether a transcript is accurate before the transcript is given to the jury and the recording is played."

## VII

■ We believe the majority rule as discussed above, that properly authenticated transcripts can be used by a jury as an aid to listening to the playing of tapes but not sent to the jury room for their deliberations, and only after proper cautionary instructions have been made by the court, is the better rule and we hereby adopt it.

■ It is within the discretion of the trial court to adopt any proper procedures to prevent the jury from using transcripts during their deliberations. The trial court should carefully instruct the jury as to limitations of the use of transcripts before the jury sees them and, in the discretion of the trial court, probably during the formal instructions to the jury before it begins its deliberations. The jury must be advised that the written transcript cannot convey all the various meanings of words and phrases that are conveyed by the human voice

through tone, inflection, and nuance and that what they hear must take precedence over what they read.

■ Absent an agreement by the parties that the transcripts can be used as evidence, they must never be sent to the jury room during their deliberations.

■ If the accuracy of the transcripts is not stipulated, they must be authenticated by testimony or, in the alternative, the court may exercise its discretion to compare transcripts with the recording and, probably with the help of counsel, produce a transcript that it believes is sufficiently accurate for the jury to read. We do not believe that a defendant should be required to produce his own complete version of a transcript, but it is necessary that the defendant be given in advance copies of any transcript the state proposes to present and that the defendant be given sufficient time to study the transcript and hear the tape to compare the two and present to the court any proposed discrepancies or inaccuracies. Defendant's counsel certainly should be allowed to present to the jury at the time of the playing of the tapes the defendant's version of the words being heard by the jury.

We believe these guidelines provide sufficient balance between the inherent dangers of a jury's relying on a transcript and the reasonable use of transcripts by the prosecution (or any party presenting them) to assist a jury's understanding of the tape recording it listens to. The trial court necessarily has wide discretion to operate within these guidelines and even to veer from them in appropriate situations and with explanations by the trial court.

## VIII

■ Since the trial court did not allow the use of the transcripts only as a listening aid in the case *sub judice,* but sent them into the jury room during its deliberations and with no limiting instructions specifically regarding the use of the transcripts by the jury, it is apparent that error was committed. But that is not the end of our inquiry.

■ The use of transcripts by a jury is an evidence issue and does not rise to the level of a constitutional issue. *Grimes v. Wainwright* (N.D.Fla.1972), 346 F.Supp. 713. If the error does not affect the appellant's substantial rights, it is harmless. Crim.R. 52(A); *Smith, supra.* Where a defendant's guilt is proven by overwhelming evidence other than transcripts (*Swanson, supra* ) and the defendant can point to no specific prejudicial inaccuracies in a transcript that counter more than sufficient evidence of guilt outside the transcript (*Smith, supra* ), the error can be found to be harmless and the conviction affirmed.

We are unable, however, in the case *sub judice* to determine beyond a reasonable doubt that the error was harmless. The jury convicted the appellant on Count IV where no tape recording or transcript was introduced. The jury acquitted the appellant on Counts I and II, where a tape and transcripts were presented, but convicted him on Count III, where also the tape and a transcript had been presented. The garbled condition and substantially inaudible portions of the tape leave us no option but to believe the jury could and probably did rely heavily upon the transcripts during their deliberations. We have noted distinct differences in the transcripts between the three alleged drug transactions in Counts I, II and III. The transcript for the offense listed in Count III seems to be the most specific regarding an actual purchase. Even though the confidential informant testified as to the events underlying Counts I, II, and III, we cannot say that the jury in its deliberations was not tipped towards a finding of guilty in Count III as against not guilty findings in Counts I and II, because it had the transcript before it. The appellant did testify in his own defense in this case. There was thus an issue of credibility for the jury to determine. We cannot be sure from the record, again beyond a reasonable doubt, that the issue of credibility was not tipped in favor of the state under Count III by the transcript.

The appellant's assignment of error is sustained. The conviction under Count III, where the transcript in issue was used by the jury, is reversed, but the conviction under Count IV, where no tape or transcript was offered, is affirmed. This case is remanded for further proceedings consistent with this opinion.

*Judgment reversed in part,*
*affirmed in part*
*and cause remanded.*

BROGAN and FAIN, JJ., concur.