[Cite as *State v. Maurent*, 2013-Ohio-3799.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | Case No. 12 CAA 05 0055 |
| | : | |
| FELIX A. MAURENT | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Delaware County Court
of Common Pleas, Case No.
12CRI020063

JUDGMENT:      AFFIRMED

DATE OF JUDGMENT ENTRY:      August 23, 2013

APPEARANCES:

For Plaintiff-Appellee:                    For Defendant-Appellant:

CAROL HAMILTON O'BRIEN                     ROBERT ALAN BRENNER
DELAWARE CO. PROSECUTOR                    P.O. Box 341021
GREGORY A. TAPOCSI                         Beavercreek, OH 45434-1021
140 N. Sandusky St., 3rd Floor
Delaware, OH 43015

*Delaney, J.*

{¶1}   Appellant Felix A. Maurent appeals from the decisions of the Delaware County Court of Common Pleas overruling his Motions to Suppress and convicting and sentencing him upon nine criminal offenses.  Appellee is the state of Ohio.

### FACTS AND PROCEDURAL HISTORY

*The Victim is Embroiled in Litigation with Andrew Levine*

{¶2}   Kevin Davidsen met Andrew Levine in late 2002 or early 2003 through his employment at the time with Johnson & Johnson.  Davidsen and Levine became friends and decided to embark upon a real estate venture in which they built high-end homes in desirable vacation destinations.  Davidsen and his father provided investment capital and Levine coordinated the contractors and details of the projects.

{¶3}   Davidsen and Levine bought a lot in Crestview, Colorado and built a high-end ski-in, ski-out home.  After the home was completed it burned down in a fire that was determined to be arson.  Levine was supposed to be working with insurance companies and handling the business details but Davidsen and his father couldn't get any response from him.  Eventually, Davidsen and his father sued Levine.  In the course of the lawsuit, they discovered Levine had taken out additional mortgages on the property and received insurance payouts they weren't told about.  A sum of $300,000 was held in escrow pending the outcome of the litigation.

*Home Invasion:  Victim is Ordered to Drop the Suit*

{¶4}   Davidsen lived with his wife and two young children in a subdivision on Upper Cambridge Way in Genoa Township, Delaware County, Ohio.  At the time of

these events, Davidsen's wife was nine months pregnant with their third child.  On the evening of February 1, 2011, the Davidsens had plans to eat dinner at their neighbors' home a few houses away at 6:00 p.m.  The weather was harsh that day; road conditions were snowy and icy, and later that night the power would go out for several hours.

{¶5} Shortly before 6:00 p.m. Davidsen was not yet home from work.  And planned to meet his family at the neighbors' house.  As she prepared to leave the house, Mrs. Davidsen went to the front door to turn on the porch light and was surprised when the doorbell rang.  She looked outside and saw two men she didn't recognize, but no car or truck in her driveway.  This struck her as "bizarre" because of the inclement weather.  The men were not dressed appropriately and were wearing light jackets.  Mrs. Davidsen described them as possibly Hispanic or light-skinned African-American males; one was taller than the other.  Mrs. Davidsen did not answer the door and eventually the two men walked away.  She went to an upstairs window and watched them walk down the street until they were out of view.

{¶6} Mrs. Davidsen proceeded to the garage and put her two children into the car just as her husband arrived home.  Together the family went to the neighbors' house for dinner and stayed until about 8:00 p.m.  Upon their return home, they watched T.V. for a few minutes before heading upstairs to put their kids to bed.  Davidsen and his wife were in separate bedrooms reading to their children when someone rang the doorbell and pounded on their front door.

{¶7} Davidsen went downstairs while his wife and children remained upstairs. The front porch was illuminated and he could see two Hispanic males outside his front door, facing "sideways" away from the door.  Davidsen asked "What do you want?"

through the door, and one of the men replied, "We need to talk." Davidsen did not recognize the men and was suspicious: his wife had mentioned the two men from earlier, and now it was 8:45 p.m., dark, snowing, and even worse weather conditions.

{¶8} One of the two men did all of the talking and the other did not speak. The taller of the two, who seemed to be in charge, told Davidsen they needed to talk about the house next door which was in foreclosure. Davidsen said no, it was too late, and told the men to leave. He also picked up a cordless phone and walked upstairs to the first-level landing where his wife was standing. Davidsen called Dan George, the neighbor he had dinner with, and told him two strange men were at the door and something wasn't right. He asked George if he could come by and make sure everything was all right. George said he would head over. In the meantime, Mrs. Davidsen called 911 on a cell phone.

{¶9} The men began pounding on the door again. This time, the same one stated, "Let me in. I'm an agent and I need to speak to you." He told Davidsen to come to the window. Davidsen complied and looked out the window; the man flashed some kind of badge that Davidsen didn't see clearly. As the larger of the two men was repeatedly yelling for Davidsen to let him in, Mrs. Davidsen told him not to open the door. Then the man who had not spoken showed Davidsen a gun.

{¶10} Davidsen decided to open the door, afraid the men might try to shoot through it, believing police and a neighbor were presumably on their way. The larger man still did all the talking, ordering Davidsen to get down on the floor. Davidsen dropped to his hands and knees in the foyer. The two men stood over him, one pointing the gun and the other yelling at Davidsen, "Drop the [expletive] lawsuit. Release the

[expletive] money or we'll kill you. You know what this is about." The front door was still open and Davidsen saw Dan George's vehicle pull into his driveway. The intruders then ordered Davidsen further into the house, forcing him into the kitchen.

{¶11} The larger man again ordered Davidsen to get down on the kitchen floor and continued yelling that if he didn't drop the lawsuit, they would kill him and his entire family. Davidsen heard George honking his car horn in the driveway. The intruders walked out of the kitchen, stepping on Davidsen's hand and puncturing his fingernail as they left. Davidsen remained on the floor for a moment, jumped up, and shut and locked the back door, then ran to the front door and signaled to Dan George that he was O.K. and the intruders were gone. Davidsen ran upstairs to check on his family, still hiding in a bedroom closet. Mrs. Davidsen was still on the phone with 911 and advised that police were on the way.

{¶12} Police arrived soon thereafter and checked the entire house and surrounding area. They were unable to locate the intruders that night. Davidsen cooperated fully with the investigation and provided a detailed description of the speaking intruder, resulting in an accurate sketch of the perpetrator, later identified as appellant.

*Victim Returns to Work to Discover More Threats*

{¶13} Mrs. Davidsen gave birth to the couple's third child on February 10, 2011. Shortly thereafter, Davidsen returned to work after several weeks off due to the home invasion ordeal and the birth of his child. On his work voice mail, he discovered two separate messages that had been left the day after the home invasion. A man stated, "I told you yesterday to release the [expletive] money or I'll hunt you down and I'll hunt

your family down. I know where your sister lives in South Boston. I know where your brother lives in the Boston suburbs. I know where your parents live in Arizona." Davidsen recognized the voice as that of the man who threatened him inside his house. The information about his family's whereabouts was also accurate.

*Victim's Sister is Threatened in South Boston*

{¶14} Gretchen Davidsen is Kevin's sister and lives in a condo in South Boston. On February 9, 2011, her doorbell buzzer rang and a male voice said "Tell your brother to release the money." Gretchen was taken aback and told the person he had the wrong number. The man said, "Tell your brother to do what I said." Gretchen replied, "My brother doesn't live here." The man answered, "I know. He lives in Ohio." Gretchen said she was going to call the police and the man threatened to smash her window. This conversation took place over her condo intercom and her view of the speaker was blocked by an awning. Gretchen was unaware of the home invasion at Kevin's house, but she called him immediately to tell him about the conversation at her condo. Kevin then told her about the home invasion and told her to call the police right away. The Boston police never developed any suspects.

*The Investigation Leads to Appellant's Cell Phone*

{¶15} The Genoa Township (Ohio) Police Department initially had few leads in the case. Detective Michel Riehle was the lead investigator and spent the early days of the investigation checking area hotels and rental car agencies with no results. The key to the investigation was the link to Davidsen's business partner, Andrew Levine, whom Riehle knew was based on the East Coast but not in Ohio. In light of the threats that

had been made referencing the lawsuit, Riehle asked the F.B.I. to assist in anticipation of out-of-state suspects.

{¶16} The voice mails left on Davidsen's work phone eventually led to the break in the case. Although the caller had pressed *67 and blocked his number for Caller ID purposes, Riehle was able to subpoena telephone records of the workplace and discover the number that made the two threatening calls: 201-898-1882. By simply performing a Google search on this telephone number, Riehle turned up the website for a private security firm and its president, Felix A. Maurent (appellant). Appellant's photo was prominently featured on the security firm's website and appellant was demonstrated to be the subscriber for this cell number.

{¶17} Riehle obtained more information on appellant, including his B.M.V. photo from New Jersey. This photo was eventually included in the array shown to Kevin Davidsen, who immediately selected appellant as the intruder who threatened him inside his home on February 1, 2011.

{¶18} Appellant's cell phone records were also introduced at trial. The State presented text messages on the day of the home invasion between appellant's cell phone and a phone "associated with" Andrew Levine. In the texts, appellant asks "Levine" how old the victim is, where he works, how many people might be in the house, and what the victim's wife's name is. "Levine" urges appellant not to tip the victim off ahead of time, to wait until dark, to "talk to the wife" if he can't get the guy and to urge her to pass it on, and promises him another $2000 if he finishes the job that night. The State also presented an expert in cell phone records analysis who demonstrated for the jury how the cell phone registered to appellant "traveled" on February 1, 2011 from east

to west across Pennsylvania, onto I-70, onto the Polaris Parkway, and within a few hundred yards of Kevin Davidsen's residence.

{¶19} Items found when a search warrant was executed at appellant's apartment in New Jersey tied up remaining loose ends. A cell phone was found with the same serial number as the phone utilized in the records. Appellant was found to have an Australian girlfriend; calls and texts on the phone had been made to Australian numbers. Investigators found "badges" of the type flashed at Davidsen before the home invasion. Incredibly, in a laundry bag, investigators even found toll receipts dated February 8, 2011 from the George Washington Bridge, Henry Hudson Bridge, and Massachusetts Turnpike—a route which appellant arguably may have used if he had traveled to Gretchen Davidson's condo in South Boston.

{¶20} Upon his arrest, appellant eventually admitted he was hired by Andrew Levine[1] to go to Ohio to extort Kevin Davidsen into dropping the lawsuit. Appellant and two accomplices went to Ohio; appellant and an accomplice named "George" went to South Boston to threaten Davidsen's sister. Appellant insisted that in both instances, he stayed in the car while "George" threatened Kevin Davidsen in Ohio and Gretchen Davidsen in Massachusetts.

*Indictment, Suppression, Trial, and Conviction*

{¶21} Appellant was charged by indictment with one count of aggravated burglary with a firearm specification [R.C. 2911.11(A)(1)], one count of aggravated burglary with a firearm specification [R.C. 2911.11(A)(2)], two counts of kidnapping with firearm specifications [R.C. 2905.01(A)(2)]; two counts of kidnapping with firearm

---

[1] Andrew Levine committed suicide before he could be charged in connection with these events.

specifications [R.C. 2905.01(A)(3)]; one count of extortion with a firearm specification [R.C. 2905.11(A)(2)], and two counts of extortion [R.C. 2905.11(A)(2)].[2] Appellant entered pleas of not guilty and moved to suppress evidence obtained during his custodial interrogation and as a result of the photo lineup procedure. Two separate suppression hearings were held.

{¶22} The first hearing focused on the photo lineup. Special Agent Trombitas of the F.B.I. testified that once appellant's B.M.V. photo was obtained from New Jersey, he asked a detective from the Columbus Police Department to use a computer program to put together a photo lineup including appellant's photo. The Columbus detective pulled up ten random photos of persons matching appellant's descriptive characteristics, selected five of those persons for the array, clicked "save," and the computer scrambled the five random photos, along with appellant's, into a "six-pack" array. The Columbus detective then printed the array for Trombitas to show to Kevin Davidsen. The Columbus detective's only involvement in the case was preparing the array; he played no role in showing it to Davidsen. Trombitas was present when the array was presented to Davidsen, who was first advised that the suspect's photo may or may not be included. Trombitas testified as to Davidsen's physical reaction to appellant's photo: he immediately picked appellant and started to "tear up" and "shake in disbelief." Trombitas acknowledged the procedural dictates of R.C. 2933.83 were not followed; for example, 10 separate folders were not used, although the guidelines of overall fairness were used.

---

[2] These charges relate to offenses appellant committed against victim Kevin Davidsen. The trial court granted appellant's Crim.R. 29(A) motion for acquittal at the close of appellee's evidence relative to kidnapping counts on behalf of Mrs. Davidsen and the Davidsen children.

{¶23} The second suppression hearing focused on appellant's custodial interrogation. Appellant was arrested in New Jersey on February 1, 2012. He was taken into custody and transported by deputies of the Hudson County (New Jersey) Sheriff's Department. Upon arrival at the Hudson County Sheriff's Department, appellant was brought into the booking area, Mirandized, searched, and placed in a holding cell. About three hours later, a team of officers from the F.B.I., U.S. Marshals, and other agencies questioned appellant without re-Mirandizing him. Appellant told several different versions of events, but ultimately admitted to traveling to Ohio to extort Davidsen at the urging of Andrew Levine. At one point appellant was returned to the holding cell and later brought back for more questioning; at that point, officers asked whether he had been Mirandized in the booking area and he was told that those rights applied to the earlier conversation. Appellant did not invoke his rights and freely spoke with officers.

{¶24} The trial court overruled appellant's motions to suppress and the case proceeded to jury trial. Appellant was found guilty of the remaining charges[3] and sentenced as follows: Count 1 (aggravated burglary), 8 years plus 3 years for the firearm specification;[4] Counts 2 (aggravated burglary) and 3 (kidnapping) merged with Count 1and no sentence was imposed; Count 4 (kidnapping), 3 years; Counts 5 (kidnapping) and 6 (kidnapping) merged with Count 4 and no sentence was imposed; Count 13 (extortion) , 24 months; Count 14, extortion, 12 months, and Count 15, extortion, 12 months. The trial court specified the terms as to Counts 4 and 13 are to be served concurrently; the terms as to Counts 14 and 15 are to be served consecutively.

---

[3] See footnote 2, supra.
[4] The remaining firearm specifications merged for purposes of sentencing.

{¶25} Appellant now appeals from the judgment entries of the trial court overruling his motions to suppress and of his convictions and sentence.

{¶26} Appellant raises three assignments of error:

**ASSIGNMENTS OF ERROR**

{¶27} "I.  THE TRIAL COURT ERRED WHEN IT OVERRULED MAURENT'S MOTION TO SUPPRESS."

{¶28} "II.  THE TRIAL COURT ERRED WHEN IT ALLOWED A RECORDING OF A JAIL CALL OVER OBJECTION."

{¶29} "III.   THE TRIAL COURT ERRED WHEN IT FAILED TO MERGE COUNTS I, IV, XIII, XIV, AND XV."

**ANALYSIS**

I.

{¶30} In his first assignment of error, appellant argues the trial court erred in overruling his motion to suppress.

{¶31} Appellate review of a trial court's decision to deny a motion to suppress involves a mixed question of law and fact.  *State v. Long*, 127 Ohio App.3d 328, 332, 713 N.E.2d 1 (4th Dist.1998).  During a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to resolve questions of fact and to evaluate witness credibility.  *State v. Brooks*, 75 Ohio St.3d 148, 154, 661 N.E.2d 1030 (1996).  A reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence.  *State v. Medcalf*, 111 Ohio App.3d 142, 145, 675 N.E.2d 1268 (4th Dist.1996).  Accepting these facts as true, the appellate court must independently determine as a matter of law, without deference to the trial

court's conclusion, whether the trial court's decision meets the applicable legal standard. *State v. Williams*, 86 Ohio App.3d 37, 42, 619 N.E.2d 1141 (4th Dist.1993), overruled on other grounds.

{¶32} There are three methods of challenging a trial court's ruling on a motion to suppress on appeal. First, an appellant may challenge the trial court's finding of fact. In reviewing a challenge of this nature, an appellate court must determine whether the trial court's findings of fact are against the manifest weight of the evidence. See, *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982); *State v. Klein*, 73 Ohio App.3d 486, 597 N.E.2d 1141 (4th Dist.1991). Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. See*, Williams*, supra. Finally, an appellant may argue the trial court has incorrectly decided the ultimate or final issues raised in a motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. *State v. Curry*, 95 Ohio App.3d 93, 96,620 N.E.2d 906 (8th Dist.1994).

*Statements*

{¶33} Appellant first argues the trial court erred in overruling his motion to suppress his statement to police on February 1, 2012 because the statement was made in violation of his *Miranda* rights. We disagree.

{¶34} In order for an accused's statement to be admissible at trial, police must have given the accused a Miranda warning if there was a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 471, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). If that

condition is established, the court can proceed to consider whether there has been an express or implied waiver of Miranda rights. Id. at 476.  In this case, appellant was Mirandized during the booking process, placed in a holding cell, and brought into an interrogation approximately three hours later.  He was not re-Mirandized prior to that interrogation.

{¶35} Appellant was Mirandized during his time in custody but not immediately prior to the interrogation; the issue therefore is whether the warnings became "stale."  In *State v. Roberts*, 32 Ohio St.3d 225, 513 N.E.2d 720 (1987), the Ohio Supreme Court applied a totality of the circumstances test and found that warnings given earlier had gone stale by the time the defendant made incriminating statements:

> The following criteria are set forth: " * * * (1)[T]he length of time between the giving of the first warnings and subsequent interrogation, * * * (2) whether the warnings and the subsequent interrogation were given in the same or different places, * * * (3) whether the warnings were given and the subsequent interrogation conducted by the same or different officers, * * * (4) the extent to which the subsequent statement differed from any previous statements; * * * [and] (5) the apparent intellectual and emotional state of the suspect. * * *
>
> *State v. Roberts*, 32 Ohio St.3d 225, 232, 513 N.E.2d 720 (1987),
>
> citations omitted.

In this case, the statements were made in the same location, albeit in an interrogation room as opposed to the booking area.  Appellant was interrogated by a team of officers

from the F.B.I., U.S. Marshals, and Connecticut State Police, not by the New Jersey county sheriff's deputy who Mirandized him upon booking. Appellant thereupon made the first statements he gave to any law enforcement about his involvement in the Davidsen Ohio home invasion, which changed over several iterations. His demeanor was described as calm and controlled.

{¶36} Under the totality of the circumstances, we do not find appellant's Miranda warnings were rendered stale within the 3-hour time frame. We note the decision of the U.S. Supreme Court in *Berghuis v. Thompkins*, 560 U.S. 370, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010), in which the Court found no *Miranda* violation where the suspect made a statement nearly three hours after receiving his Miranda warning:

> "If Thompkins wanted to remain silent, he could have said nothing in response to Helgert's questions, or he could have unambiguously invoked his *Miranda* rights and ended the interrogation. The fact that Thompkins made a statement about three hours after receiving a *Miranda* warning does not overcome the fact that he engaged in a course of conduct indicating waiver. Police are not required to re-warn suspects from time to time. Thompkins' answer to Helgert's question about praying to God for forgiveness for shooting the victim was sufficient to show a course of conduct indicating waiver."
>
> *Id.* at 2263.

{¶37} Appellant was briefly removed from the interrogation, placed in a cell, then brought back in for further questioning. Upon being returned for questioning, officers asked whether he had been Mirandized upon his arrival at the detention center;

appellant stated that he had and that he understood those rights applied to the conversation earlier.  As in *Berghuis*, supra, we find it relevant that appellant freely answered the officers' questions and at no time invoked his Miranda rights or sought to end the interview.

{¶38} We find that the trial court did not err in finding that under the totality of the circumstances; appellant's Miranda warnings were neither stale nor insufficient.

*Photo Lineup Procedure*

{¶39} Appellant further argues the trial court should have suppressed Davidsen's out-of-court identification of him from the photo lineup and also his subsequent in-court identification.  We disagree.

{¶40} When a witness is shown a photograph of a suspect before trial, due process requires a court to suppress the photo identification of the suspect if the photo array was unnecessarily suggestive of the suspect's guilt and the identification was not reliable. *State v. Waddy,* 63 Ohio St.3d 424, 438, 588 N.E.2d 819 (1992), superseded by constitutional amendment on other grounds. The defendant has the burden to show the identification procedure was unduly suggestive. *State v. Harris,* 2nd Dist. Montgomery No. 19796, 2004–Ohio–3570, ¶ 19. If the defendant meets that burden, the court must then consider whether the identification, viewed under the totality of the circumstances, is reliable despite its suggestive character. *Id.,* citing *State v. Wills,* 120 Ohio App.3d 320, 324, 697 N.E.2d 1072 (8th Dist.1997). If the pretrial confrontation procedure was not unduly suggestive, any remaining questions as to reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required. *Id.*, 120 Ohio App.3d at 325.

{¶41} The focus under the totality of the circumstances approach is on the reliability of the identification, not the identification procedures. *State v. Jells*, 53 Ohio St.3d 22, 27, 559 N.E.2d 464 (1990), cert. denied (1991), 498 U.S. 1111, 111 S.Ct. 1020, 112 L.Ed.2d 1101. R.C. 2933.83 sets forth the minimum requirements to be followed for a photo lineup procedure.

{¶42} In this case, the F.B.I. witness acknowledged the procedural strictures of R.C. 2933.83 were not followed; although he is somewhat familiar with its requirements, at the time of the photo lineup process, it appeared the case would be pursued by federal agencies. Even where the letter of R.C. 2933.83 is not followed, evidence of failure to comply may be taken into account by the trial court in determining a motion to suppress and by the trier of fact in weighing the reliability of the identification resulting from the procedure. The record establishes extensive cross-examination on officers' failure to comply with the statute at the suppression hearing and trial.

{¶43} In this case, based upon the totality of the circumstances, the photo lineup was not unduly suggestive. We have reviewed the array and disagree with appellant's characterization that appellant's was the only photograph in the array matching Davidsen's given description. Each of the photographs has minor deviations in facial hair, setting of the ears, etc., but collectively the array is not so unduly suggestive as to give rise to a substantial likelihood of irreparable misidentification. The close similarity between appellant's B.M.V. photo and the sketch created from the victim's memory is due to the victim's remarkable recall of appellant's face, evidenced by his physical and emotional reaction upon immediately picking appellant out of the photo array. Davidsen actually wept upon seeing appellant's face again, and the F.B.I. agent who showed him

the array testified he's never witnessed such a strong reaction in eyewitness identification. Appellee established the reliability of Davidsen's out-of-court and in-court identifications.

{¶44} Upon review of the record and the testimony, we do not find the officers failed to comply with the provisions of R.C. 2933.83, nor do we find the procedures utilized were unduly suggestive or created a substantial likelihood of misidentification. Accordingly, we find the trial court properly overruled appellant's motion to suppress the identification. See, *State v. Oester*, 5th Dist. Stark No. 2012CA00118, 2013-Ohio-2676, ¶ 35.

{¶45} The trial court properly overruled the motions to suppress. Appellant's first assignment of error is overruled.

II.

{¶46} In his second assignment of error, appellant argues the trial court erred in admitting the recording of a telephone call made by appellant while incarcerated. We disagree.

{¶47} The admission or exclusion of evidence is a matter left to the sound discretion of the trial court. Absent an abuse of discretion resulting in material prejudice to the defendant, a reviewing court should be reluctant to interfere with a trial court's decision in this regard. *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967). To be admissible, a tape recording must be authentic, accurate, and trustworthy. *State v. Were*, 118 Ohio St. 3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶109, citing *State v. Rogan*, 94 Ohio App.3d 140, 148, 640 N.E.2d 535 (1994).

{¶48} In this case, appellee sought to introduce evidence in the form of a CD of a telephone call made by appellant while he was incarcerated in the Hudson County, New Jersey jail. The CD was introduced by the State during the testimony of Detective Riehle of the Genoa Township (Ohio) Police Department. As context, Riehle testified he subpoenaed all jail calls made by appellant during his time in custody at the Hudson County jail. The CD of all of appellant's calls was accompanied by a "notarized letter" from a lieutenant of the Hudson County Jail certifying that the calls on the CD are true and accurate copies of calls made by appellant, downloaded and transferred onto the CD in New Jersey. Riehle testified that he listened to all of the calls, listening for any reference to the case, and that it is appellant's voice on the calls.

{¶49} Riehle then made his own CD as a trial exhibit of a portion of one of these calls, in which appellant is speaking to an unidentified woman and uses the phrase "as soon as possible…." Appellee's purpose in admitting the call was not the content of the conversation but so that the trier of fact could compare appellant's (known) voice on the jail call with the threatening messages left on the victim's voice mail.

{¶50} Appellant objected before the recording was played for the jury on the basis that the recording was not properly authenticated. The trial court overruled the objection, agreeing with the State that the CD recording of the call, as accompanied by the notarized letter, is "self-authenticating." We find no authority in support of the argument that the recording is "self-authenticating," however, we find the trial court did not abuse its discretion in admitting it. In *State v. Tyler*, the Fourth District reviewed the requirements for admission of a recording such as this one, and found the threshold of admission to be "quite low:"

Evid.R. 901 governs the authentication of demonstrative evidence such as recordings of telephone conversations. The threshold for admission is quite low, as the proponent need only submit "evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). This means that "the proponent must present foundational evidence that is sufficient to constitute a rational basis for a jury to decide that the primary evidence is what its proponent claims it to be." *State v. Payton* (Jan. 25, 2002), Ross App. No. 01CA2606, 2002 WL 184922, at *3, citing *State v. Isley* (June 26, 1996), Summit App. No. 17485, 1996 WL 351154, citing *State v. Caldwell* (Dec. 4, 1991), Summit App. No. 14720, 1991 WL 259529. A proponent may demonstrate genuineness or authenticity through direct or circumstantial evidence. *State v. Williams* (1979), 64 Ohio App.2d 271, 274, 413 N.E.2d 1212.

To be admissible, a sound recording of a telephone call must be "authentic, accurate, and trustworthy." *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, at ¶ 109, citing *State v. Rogan* (1994), 94 Ohio App.3d 140, 148, 640 N.E.2d 535. Evid.R. 901 provides for two theories upon which a trial court might admit a sound recording. Giannelli, **18 Evidence (3d Ed.2010) 409, Section 901.19. First, Evid.R. 901(B)(5) provides for authentication by voice identification "whether heard firsthand or

through mechanical or electronic transmission or recording."
Second, under Evid.R. 901(B)(9), a sound recording may be
authenticated through evidence that demonstrates a process or
system used that produces an "accurate result."

*State v. Tyler*, 196 Ohio App.3d 443, 2011-Ohio-3937, 964 N.E.2d
12 (4th Dist.), ¶ 25-26.

{¶51} In this case, we find the foundational evidence was sufficient for the trial court to allow the State to introduce the recording of the call.  Riehle testified he listened to the original calls, created the recording of the call, and he recognized appellant's voice on the jail call.

{¶52} We note appellant also raises a Confrontation Clause argument in this assignment of error relative to the notarized letter from the New Jersey Deputy Sheriff, which is neither testimonial in nature nor hearsay.  "To trigger a violation of the Confrontation Clause, an admitted statement must be testimonial in nature, and must be hearsay." *State v.* Smith, 5th Dist. Guernsey No. 2012-CA-17, 2013-Ohio-1226, ¶ 24, citing *United States v. Deitz,* 577 F.3d 672, 683 (6th Cir.2009).

{¶53} Finally, even if we were to find admission of the recording was in error, such error would be harmless because of the overwhelming evidence of appellant's guilt.  Harmless errors are to be disregarded and the erroneous admission or exclusion of evidence is not reversible unless it affects a substantial right that prejudices the defendant. See, Crim.R. 52(A); Evid.R. 103(A); *State v. Brown*, 65 Ohio St.3d 483, 485, 605 N.E.2d 46 (1992).

{¶54} Appellant's second assignment of error is overruled.

III.

{¶55} In his third assignment of error, appellant argues the trial court erred in failing to merge some of his convicted offenses for sentencing. We disagree.

{¶56} R.C. 2941.25 states as follows:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶57} In *State v. Johnson*, the Ohio Supreme Court modified the test for determining whether offenses are allied offenses of similar import. 128 Ohio St.3d 1405, 2010–Ohio–6314. The Court directed us to look at the elements of the offenses in question and determine whether or not it is possible to commit one offense and commit the other with the same conduct. If the answer to such question is in the affirmative, the court must then determine whether or not the offenses were committed by the same conduct. If the answer to the above two questions is yes, then the offenses are allied offenses of similar import and will be merged. If, however, the court determines that commission of one offense will never result in the commission of the other, or if there is

a separate animus for each offense, then the offenses will not merge according to *Johnson*, supra.

{¶58} Appellant was indicted upon, convicted of, and sentenced upon one count of aggravated burglary pursuant to R.C. 2911.11(A)(1), one count of kidnapping pursuant to 2905.01(A)(2), and one count of extortion pursuant to R.C. 2905.11(A)(2) for the February 1, 2011 home invasion. Appellant argues the trial court committed plain error when it failed to merge these offenses for purposes of sentencing.

{¶59} Appellant forced his way into Davidsen's home, held him under threat of use of a firearm, and threatened to kill him and his family if he didn't drop the Levine suit. We disagree with appellant's characterization of these events as a single act of "delivering a message." Appellant's actions constituted both separate conduct and separate animus under these circumstances. *Id.* Appellant was properly convicted of and sentenced upon three separate offenses.

{¶60} Appellant further argues that the final two extortion counts should merge. Counts 13 and 14 represent the two threatening messages left on Davidsen's voice mail at work, minutes apart. These voice mails are in the record as State's Exhibit 9 and we have reviewed them. We decline to merge these offenses together or with any other offenses. In the first message, appellant states, e.g., he's not playing games, and as he told Kevin Davidsen at his house, he will come after his mother and father in Arizona, his sister in South Boston, and his brother in the Boston suburbs if he doesn't "drop the allegations." In the second message, appellant states, e.g., "for the last time, I will come back up there and kill you and your entire [expletive] family including…your brother and his children in Boston; this is what I do for a living; these are your orders;

I'm coming back for you." Temporal proximity does not equate to a single continuous incident in this case; appellant reiterated his threat and intensified it, mentioning even his brother's children to get Davidsen's attention.

{¶61} We find each of these offenses was committed with separate conduct and a separate animus, and the trial court properly declined to merge the offenses for sentencing. Appellant's third assignment of error is overruled.

## CONCLUSION

{¶62} Appellant's three assignments of error are overruled.

{¶63} The judgment of the Delaware County Court of Common Pleas is affirmed.

By: Delaney, J. and

Baldwin, J. concur with

Hoffman, P.J.dissenting and

concurring separately.

.

_____
HON. PATRICIA A. DELANEY


_____
HON. WILLIAM B. HOFFMAN


_____
HON. CRAIG R. BALDWIN

*Hoffman, P.J., concurring in part and dissenting in part*

{¶64} I concur in the majority's analysis and disposition of Appellant's first and second assignments of error.

{¶65} I further concur in the majority's analysis and disposition of Appellant's third assignment of error with the singular exception I find the kidnapping charge merges into the aggravated burglary and/or extortion charge(s).


_____

HON. WILLIAM B. HOFFMAN