[Cite as *State v. Gibson*, 2016-Ohio-8552.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | |
| | ) | |
|     PLAINTIFF-APPELLEE | ) | |
| | ) | CASE NO. 15 MA 0074 |
| VS. | ) | |
| | ) | OPINION |
| RYAN GIBSON | ) | |
| | ) | |
|     DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:    Criminal Appeal from the Court of Common Pleas of Mahoning County, Ohio
Case No. 14 CR 1123A

JUDGMENT:    Affirmed.

APPEARANCES:
For Plaintiff-Appellee

Attorney Paul Gains
Mahoning County Prosecutor
Attorney Ralph Rivera
Assistant Prosecutor
21 West Boardman Street, 6th Floor
Youngstown, Ohio 44503-1426

For Defendant-Appellant

Attorney Lynn Maro
7081 West Boulevard, Suite 4
Youngstown, Ohio 44512-4362

JUDGES:

Hon. Mary DeGenaro
Hon. Gene Donofrio
Hon. Cheryl L. Waite

Dated: December 29, 2016

DeGENARO, J.

{¶1} Defendant-Appellant Ryan Gibson appeals the judgment of the trial court convicting him of one count of burglary and sentencing him accordingly. On appeal, Gibson contends the trial court erred by admitting recordings of his jailhouse phone calls. He also asserts his convictions are against the manifest weight of the evidence and that his sentence was erroneous. For the following reasons, Gibson's assignments of error are meritless and the judgment of the trial court is affirmed.

## Facts and Procedural History

{¶2} Gibson was indicted by a grand jury of aggravated robbery, R.C. 2911.01(A)(1) and (C), and of aggravated burglary, R.C. 2911.11(A)(2) and (B), both first-degree felonies and each with a firearm specification, R.C. 2941.145(A). He and several accomplices were accused of entering the apartment of Michael Deiley by deception and taking his property at gunpoint. Gibson pled not guilty, and upon his motion, Gibson's trial was severed from his co-defendants, one of whom had agreed to testify against him.

{¶3} The matter proceeded to a jury trial, where the following evidence was adduced. The victim, Michael Deiley, testified that Nafeesa Fareed, Daisy Robinson, and Gibson, Robinson's boyfriend, were coming to Deiley's apartment in Austintown to buy $10 worth of marijuana. Deiley was acquainted with all three individuals, and had known them for some time. Deiley admitted that he regularly bought and sold marijuana, but denied selling other illegal narcotics such as heroin, cocaine, or LSD.

{¶4} Later that night, there was a knock on Deiley's front door. Deiley saw the two women, Fareed and Robinson, through the peephole, but did not see Gibson. When Deiley opened the door, Gibson rushed in and put a gun to his head. According to Deiley, two other males came in and ransacked his apartment while Gibson stood "over" and "behind" him, holding him down, first on the couch and then on the floor, with the gun to his head. He also testified that someone held a knife to his throat for at least part of the time.

{¶5} According to Deiley, Gibson and the other two men stole his Xbox gaming console, "maybe a half ounce" of marijuana and two cell phones, one of

which had recently been taken out of service. He described the gun Gibson used as being "silver" in color. Later, he reported to the Austintown police that they had also stolen a video game for the Xbox.

{¶6} Deiley did not call the police to report the incident until 8:30 p.m. the following day, about 21 hours after it occurred. Austintown Township Officer Daniel Burial testified he was dispatched to Deiley's apartment and took the report. Deiley told Burich that Gibson, Robinson, Fareed, and two to three unknown males had robbed him the previous night. Deiley also stated that Gibson had a handgun.

{¶7} Deiley explained that he did not contact the police earlier, because he was afraid that Gibson would retaliate against him. During his initial report, Deiley failed to tell Burich that marijuana was among the stolen items. He did eventually report the marijuana stolen during a later telephone conversation initiated by police.

{¶8} Deiley said that in the past, he had freely let Gibson into his apartment on at least a dozen occasions to buy marijuana. When asked if Gibson's presence outside his door would have caused him not to open it, Deiley said no. When asked why Gibson would have to hide behind the door if he wanted to rob him, Deiley said he did not know.

{¶9} Shortly after the incident, Deiley obtained another cell phone and used that phone to text a message to one of his phones that had been stolen. He received three responses from the stolen phone: (1) "Where u stay u scary white boy stop textin my new phone before I lay yo ass down[;]" (2) "Bye bitch u called da cops nd u forgot nigga we all kno where u stay u a scary white boy so[;] and(3) "Nd not to mention u was cryin."

{¶10} Deiley said those responses indicated that the sender or senders knew where he lived and would come back if he called the police. Deiley testified that the last person he had seen with his stolen phone was Gibson.

{¶11} Deiley also sent a Facebook message to Robinson after the incident stating the following: "I just wanna let you know bitch I got bullets for all yall broke ass niggaz bodys will be down…yall wana rob me when I always looked out for yall well

now yall gonna be dead cuz ik where yall new place is and ik where nafeesa stay at so yall fucked and the cops have yall info and names and the info to the xbox and phones too so yall really fucked either way yall dead or behind bars so hows that fat ass cunt."

{¶12} Gibson's co-defendant, Nafeesa Fareed, agreed to testify against him as part of a plea deal, in which she agreed to plead to a lesser felony charge with a recommendation of probation. Fareed testified that earlier on the day of the incident, a group that included herself, Robinson, Gibson, Gibson's two half-brothers, Savon and Javon Wesley, and another man she knew only as "Dude" had gathered at the apartment shared by Gibson and Robinson and planned the robbery. Fareed and Robinson texted Deiley later that evening to see if he was at home. Then she and Robinson took Robinson's car to Deiley's apartment while Gibson, the Wesley brothers and "Dude" took Gibson's car. They met up behind the apartment building where Deiley lived before going in.

{¶13} Fareed further testified that Gibson and the other men stood behind a wall where Deiley "probably couldn't see them" while the two women knocked on the door. When Deiley opened it, the women entered followed by Gibson, who pointed a gun at Deiley. Gibson then "held Mike [Deiley] down," first on the couch and then on the floor at gunpoint while the other three men entered and searched the apartment for "weed and money." The three men found and took "weed, money, an Xbox and a phone."

{¶14} Fareed also testified that she had never seen the gun until Gibson pointed it at Deiley. She described the gun she saw Gibson point at Deiley as a "black small gun." She did not know if it was a real gun or not. She also asserted that she never saw a knife at all during the incident.

{¶15} Fareed said a substantial amount of marijuana and an indeterminate amount of money were taken along with the Xbox and a phone. She also testified that after the robbery, she and Robinson drove to Savon and Javon Wesley's apartment, where they all "split the money" and the marijuana. When asked if she

ever saw the gun again after leaving Deiley's apartment, she said that she did not.

**{¶16}** Fareed stated she had known Deiley for "about a year" at the time of the robbery. She further testified that on prior visits to Deiley's apartment to buy marijuana, she and the others who had been to his apartment had seen "a lot of money and weed."

**{¶17}** Fareed admitted that she agreed to testify against Gibson while she was being held in jail on the same charges. She further admitted that she had desperately wanted to get out of jail, and that she told her boyfriend in a phone conversation that if she didn't get out, she would kill herself. She conceded that she wanted a plea deal and would take any offer that involved no jail time for her.

**{¶18}** She also told her boyfriend that the allegations were "some bullshit" and that she would do whatever she had to do to get out of jail. She also admitted telling her boyfriend "emphatically" while still in jail that there was no gun involved in the incident. However, she later testified that she had told him there was no gun "because I knew my conversation was being recorded."

**{¶19}** Gibson took the stand in his own defense and testified that on the day in question, his brother Savon Wesley called and asked him for a ride home from work. As they were driving to Wesley's apartment, Wesley asked Gibson if he wanted to "smoke." Gibson said he did. When they arrived at the apartment Wesley shared with his brother Javon, the Wesley brothers asked Gibson to "mesh with them," meaning to contribute an equal amount of marijuana to what they were offering for smoking. Gibson then went home to get money from Robinson, his girlfriend, to buy marijuana and said he would call them from her phone.

**{¶20}** Later that evening, Gibson took his mother to work in Austintown. After he dropped her off, Robinson and Fareed pulled up behind him in Robinson's car. Both cars then pulled into the parking lot of a nearby McDonald's where a conversation and an argument ensued. Gibson asked Robinson if she still wanted to smoke marijuana and told Fareed she could join them. The three of them then drove to Deiley's apartment to buy marijuana. Robinson had already texted Deiley to let

him know they wanted a dime bag.

**{¶21}** Gibson testified that before he and the two women arrived at Deiley's apartment, he had told them that if the bag of marijuana came up short, as it had in the past, that he planned to take it without paying.

**{¶22}** According to Gibson, he and the two women all stood right in front of the door while they knocked and Deiley let them all in. He testified that Deiley then said, "Let me go get it real quick" and went into a back room to get the bag of marijuana. Deiley returned with a dime bag that Gibson felt was smaller than it should have been. Gibson said he then took the bag and put it in his pocket and left without paying.

**{¶23}** Gibson admitted he should not have done what he did, but denied planning a robbery, or taking Deiley's jars of marijuana, his Xbox, or his cell phones. Gibson further denied having a gun on him that evening, or even owning a gun.

**{¶24}** On cross-examination, Gibson admitted that he spoke to Robinson while he was incarcerated and discussed what her testimony should be. He also admitted he told his sister that it was a "drug deal gone wrong."

**{¶25}** No forensic evidence was presented from the crime scene. Detective Yacovone testified that he never went to Deiley's apartment, but since most of those involved knew each other, fingerprint and/or DNA evidence would have been of little value. He also indicated that there were time constraints on his investigation because he had a busy caseload. He said he attempted to subpoena phone records for the stolen cell phones and to have the phones "pinged" to determine their location, but was told by phone company representatives that the records sought were unavailable and that "pinging" could not be done in this case because the phones were pay-for-use phones. Detective Yacovone also testified that police did not recover a gun, an Xbox or any Xbox games.

**{¶26}** Following foundation testimony by Mahoning County Sheriff's Deputy Joseph Duarte, a CD containing 90 phone calls made by Gibson while in jail, totaling more than 600 minutes, was admitted into evidence as a State's exhibit. The State

sought to play 10 of these calls for the jury. Apparently, when counsel were arguing admissibility, they were working from a summary that identified the 10 calls at issue; however, that summary was not made a part of the record on appeal. Further, the transcript is devoid of information directing us to which 10 of the 90 calls on the CD were played for the jury because they were not transcribed by the court reporter while they were played, nor were they isolated onto a separate CD and admitted into evidence. A list of the 90 calls can be found in the record, but again, where to find the pertinent 10 on that list is not noted.

**{¶27}** After considering all the evidence and deliberating for approximately 90 minutes, the jury acquitted Gibson on the indicted charges and firearm specifications, but found him guilty of theft, R.C. 2913.02(A), a first-degree misdemeanor, a lesser-included charge to count one, and guilty of burglary, R.C. 2911.12(A)(1), a second-degree felony, a lesser-included charge to count two. Sentencing was continued so that a pre-sentence investigation could be prepared.

**{¶28}** Following a hearing, the trial court found that the two offenses were allied offenses of similar import and therefore merged for purposes of sentencing. The prosecutor elected that the burglary charge survive the merger, and Gibson was sentenced to three years in prison with 140 days of jail-time credit and a discretionary three-year term of post-release control.

**{¶29}** This timely appeal followed.

### Jailhouse Phone Calls

**{¶30}** In his first of three assignments of error, Gibson asserts:

The trial court erred in admitting hearsay evidence through recordings of jail conversations.

**{¶31}** While he was incarcerated in the county jail Gibson made or received 90 phone calls totaling over 600 minutes, which were recorded. Although the CD containing the entire 600 minutes was ultimately admitted into evidence, the State proposed using only 10 of the 90 calls at trial. The trial court ruled that three calls

entirely or in part could not be played for the jury. Regarding five other calls, either defense counsel withdrew any objection or the prosecutor stated the call would not be used. Finally, the trial court ruled that only two calls could be played in their entirty for the jury, over Gibson's objection.

**{¶32}** Gibson raises several arguments under this assignment of error, which will be discussed out of order for clarity of analysis. Gibson first contends the recordings of his jailhouse calls were inadmissible because the State failed to properly authenticate them. Rulings regarding authentication, like evidentiary rulings more generally, are reviewed for an abuse of discretion. *State v. Lallathin*, 7th Dist. No. 299, 2003-Ohio-3478, ¶ 34-36. An abuse of discretion means the trial court's decision is unreasonable based upon the record; that the appellate court may have reached a different result is not enough to warrant reversal. *State v. Dixon*, 7th Dist. No. 10 MA 185, 2013–Ohio–2951, ¶ 21.

**{¶33}** Evid.R. 901(A) requires evidence to be properly authenticated prior to its admission into evidence: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). Such evidence may be authenticated by a witness with knowledge that the matter is what it claims to be. Evid.R. 901(B)(1).

**{¶34}** Specific to admitting a recorded phone call, the recording must be "authentic, accurate, and trustworthy." *State v. Tyler*, 196 Ohio App.3d 443, 450, 964 N.E.2d 12 (4th Dist.2001), quoting *State v. Were*, 118 Ohio St.3d 448, 2008 Ohio 2762, 890 N.E.2d 263, ¶ 109, citing *State v. Rogan*, 94 Ohio App.3d 140, 148, 640 N.E.2d 535 (2d Dist.1994). "First, Evid.R. 901(B)(5) provides for authentication by voice identification 'whether heard firsthand or through mechanical or electronic transmission or recording.' Second, under Evid.R. 901(B)(9), a sound recording may be authenticated through evidence that demonstrates a process or system used that produces an 'accurate result.' " *Tyler* at 450.

**{¶35}** Here, Mahoning County Sheriff's Deputy Joseph Duarte, who is

employed with the technical services unit at the department, testified that as part of his job responsibilities he is familiar with the recording of phone calls that occur at the jail. Duarte explained that the phone calls are "recorded digitally on hard disk on a server that resides inside the secure IT room." He stated that phone calls can be retrieved using the inmate's identification number, the actual target number, or by the inmate's name. Once he has the information, Duarte would "log into a secure portal which is provided by the company that has the phone system. We log in with our I.D. It's tracked. Locate the numbers, verify, you know, that there are recordings, download those recordings, and we basically check to see if there's audio."

**{¶36}** Duarte identified State's Exhibits 1 and 1A as a CD recording[1] of some of Gibson's phone calls, which included Gibson's name and corresponding pin number. Duarte stated that the CD is a true and accurate representation of the calls recorded from Gibson corresponding to his pin number, 0057847 during a specified time period. Further, Gibson admitted during his testimony that it was his voice on the jailhouse phone calls that were played for the jury. Accordingly, based on all of the above, the calls were properly authenticated.

**{¶37}** Gibson next argues the trial court erred by permitting some calls to be played for the jury—without specifying which of 10 calls disputed by the parties at trial—because they violate his Confrontation Clause rights or alternatively that they constitute inadmissible hearsay. Importantly, none of these 10 calls, save one, were identified with specificity in the trial record, and the trial court sustained Gibson's objection regarding that call. None were specified on appeal. Only after our review of the trial transcript were we able to glean that the trial court sustained Gibson's objections regarding three calls, ruling that all or part of those three calls could not be played for the jury. Further, regarding five calls, either defense counsel withdrew any objection or the prosecutor stated the call would not be used. Thus, it appears that over defense counsel's objections, the trial court ruled that two calls could be played

---

[1] For purposes of clarity, the CD itself bears a sticker indicating State Exhibit 1A and the envelope the CD is in bears a sticker indicating State Exhibit 1.

in their entirety for the jury.

**{¶38}** A de novo standard of review is applied to a claim that a criminal defendant's Confrontation Clause rights have been violated. *State v. Barnette*, 7th Dist. No. 11 MA 196, 2014–Ohio–5673, ¶ 26. "If the admission of the statements did not violate the Confrontation Clause, then the trial court's decision to admit the statements under the rules of evidence is reviewed for an abuse of discretion." *State v. Toney*, 7th Dist. No. 14 MA 0083, 2016-Ohio-3296, ¶ 45.

**{¶39}** The Confrontation Clause in the United States Constitution preserves the right of a criminal defendant "to be confronted with the witnesses against him." U.S. Constitution, Sixth Amendment. The United States Supreme Court has explained that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The key issue is what constitutes a testimonial statement: "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 2273, 165 L.Ed.2d 224 (2006).

**{¶40}** To determine whether a statement made to non-law-enforcement officers is testimonial, Ohio courts apply the objective-witness test. *See State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, ¶ 36. In *Stahl*, the Supreme Court of Ohio held that a testimonial statement is "one made 'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " *Id.*, quoting *Crawford*, 541 U.S. at 52.

**{¶41}** However, Gibson's brief makes only general arguments; he fails to state which specific calls and which statements in those calls he finds objectionable, explaining only that they were statements made by Robinson, a co-defendant, or by third parties referring to Robinson's statements or Gibson recounting what he was

told. More problematic is the total lack of specificity regarding where the objectionable conversations can be found on the CD that was admitted into evidence; it contains 90 phone calls totaling over 600 minutes. In a similar vein, a list of the 90 calls was filed by the State and is in the record, but again, that document fails to specifically identify the 10 calls debated by counsel. It is likewise unclear which calls, or portions thereof, the jury heard during trial.

**{¶42}** A review of the transcript reveals there was extensive discussion about the content of the calls and arguments regarding their admissibility. The trial court and counsel used written summaries of the calls to aid in their discussion, but those written summaries were not made a part of the record. A careful examination of the arguments made by counsel and the organization of the calls on the CD fails to elucidate these issues. In the transcript, counsel does make statements such as "starting with the first one." However, we have no way to determine which of the 90 calls is "the first one." The CD does group the calls by date, but within a specific date, the calls are not listed in chronological order. Instead, each call has a specific identification number; for example, AO0L1001 is the first call listed on the CD.

**{¶43}** This court has reviewed both the first call in time, and the first call listed on the CD and neither relates to counsels' arguments regarding "the first one." Instead, it appears they were referring to the first call listed on the summary, which is not included in the record before us. Had counsel referred to the calls by their specific identification numbers during arguments at trial, this court could have evaluated the admissibility of each call. An even simpler manner to make a record would have been to request that the court reporter transcribe each call as it was played for the jury.

**{¶44}** This court made an attempt to find the proverbial needles in this haystack; ultimately the trial record and Gibson's lack of specificity on appeal fails to provide us with the ability to undertake a meaningful review. Thus, we cannot test the propriety of what was played for the jury, and we will not hunt through over 600 minutes of calls in the hope of being able to divide, and then find, which calls were

debated by the parties, and which Gibson challenges on appeal. "It is not the duty of this court to search the record for evidence to support an appellant's argument as to alleged error." *Shumate v. City of Gahanna*, 10th Dist. No. 02AP-881, 2003-Ohio-1329, ¶ 6. *See also* App.R. 16(A)(7).

**{¶45}** Notably, the trial court did sustain three of Gibson's objections in whole or in part—including the only call identified by the numbering system testified to by Deputy Duarte—and the State agreed on the record to limit the playback of the audio so as not to include any inadmissible statements. Regarding five other calls, either defense counsel withdrew any objection or the prosecutor stated the calls would not be used. Over Gibson's objections, the trial court ruled that two calls could be played for the jury in their entirety. However, the trial record fails to identify which specific calls were played and the court reporter did not transcribe the contents of the calls as they were played for the jury. Without being able to discern which specific calls or portions of calls Gibson objects to, we are unable to review the merits of Gibson's Confrontation Clause arguments.

**{¶46}** Even if we were able to discern which statements were problematic and deem them testimonial, "there is no dispute the Confrontation Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' " *State v. Ricks*, 136 Ohio St.3d 356, 995 N.E.2d 1181, ¶ 18, citing *Crawford*, 541 U.S. at 59, fn. 9. Further, we recently noted, "many courts have concluded that phone calls placed from prison between co-defendants are not testimonial." *State v. Toney*, 7th Dist. No. 14 MA 0083, 2016-Ohio-3296, ¶ 50, citing *United States v. Thurman*, 915 F.Supp.2d 836, 854–55 (W.D.Ky.2013); *State v. Dennison*, 10th Dist. No. 12AP–718, 2013–Ohio–5535, ¶ 64; *Saechaeo v. Oregon*, 249 Fed.Appx 678, 679 (9th Cir.2007); *Malone v. Kramer*, E.D.Cal. No. 1:07–cv–00743 AWI SMS (HC), 2010 WL 1404286 (Apr. 6, 2010) (involving jail phone conversations between accused and his wife); *Ibarra v. McDonald*, N.D.Calif. No. C10–01145 (Apr. 26, 2011). Given the state of the record and the manner in which Gibson framed his challenge on appeal, we cannot make this assessment. Thus,

Gibson's Confrontation Clause arguments are meritless.

**{¶47}** Turning to Gibson's final argument, in a typical case, we would then go on to review whether the out-of-court statements are admissible under the rules of evidence. *See, e.g., Toney supra* at ¶ 45, 55-70. Again, we are precluded from analyzing this argument. Hearsay is an out-of-court statement, offered to prove the truth of the matter asserted and is inadmissible unless subject to a relevant exception. Evid.R. 802. Absent reference to specific statements, let alone the inability to review the contents, we cannot tell which statements on the recordings were objectionable and whether they were offered for their truth or for some other purpose. Moreover, even if some of the statements were hearsay, they would fall under the Evid.R. 801(D)(2)(e) exception, which provides a statement is not hearsay if the statement is offered against a party and is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy."

**{¶48}** In sum, given the absence of a transcription of the disputed calls as they were played for the jury, or any record of which 10 calls were contested by the parties at trial, coupled with the lack of specificity in Gibson's appellate brief, we cannot evaluate the merits of this assignment of error under any theory. Trial counsel's recounting of a summary of the disputed calls woven in with legal argument to the trial court is an insufficient record for meaningful appellate review. Accordingly, Gibson's first assignment of error is meritless.

### Manifest Weight

**{¶49}** In his second assignment of error, Gibson asserts:

Appellant's conviction and sentence violate the Fourteenth Amendment to the United States Constitution and Article I, § 16 of the Ohio Constitution as the conviction was against the manifest weight of the evidence.

**{¶50}** "Weight of the evidence concerns the inclination of the *greater amount*

*of credible evidence*, offered in a trial, to support one side of the issue rather than the other." (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A conviction will only be reversed as against the manifest weight of the evidence in exceptional circumstances. *Id.* This is so because the triers of fact are in a better position to determine credibility issues, since they personally viewed the demeanor, voice inflections and gestures of the witnesses. *State v. Hill*, 75 Ohio St.3d 195, 204, 661 N.E.2d 1068 (1996); *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).

**{¶51}** Thus, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387. However, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. No. 99 CA 149, 2002–Ohio–1152, *2, citing *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999). Under these circumstances, the verdict is not against the manifest weight and should be affirmed.

**{¶52}** Gibson was convicted of one count of burglary, a violation of R.C. 2911.12(A)(1), which provides:

> No person, by force, stealth, or deception, shall do any of the following: * * * Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense[.]

**{¶53}** There were at least two conflicting versions of the events presented at trial, and it was within the province of the fact-finder to resolve matters of credibility.

*See Hill, supra* at 204. The jury believed Deiley's account that Gibson gained entry into Deiley's apartment, either by deception, intimidation or force, while Deiley was present, with the intention to steal, at least marijuana from him. This is supported by the text messages, Fareed's testimony, and most notably, by Gibson's own testimony.

**{¶54}** Notably the jury acquitted Gibson of the more serious charges, including aggravated burglary and the firearm specifications, thus resolving conflicting evidence about Gibson's use of a weapon in his favor. Again, this determination rests upon witness credibility, which lies within the province of the jury.

**{¶55}** Accordingly, the jury clearly did not lose its way so as to create a miscarriage of justice, and Gibson's second assignment of error is meritless.

### Sentence

**{¶56}** In his third and final assignment of error, Gibson asserts:

The trial court's sentencing of Appellant to prison was contrary to law and an abuse of discretion.

**{¶57}** The abuse-of-discretion standard is no longer applicable to felony-sentencing challenges; appellate courts review a felony sentence to determine whether the trial court's findings—or where findings are not required, the sentence itself—are clearly and convincingly unsupported by the record, or whether the sentence is otherwise contrary to law. R.C. 2953.08(G)(2); *State v. Marcum*, Slip Opinion 2016-Ohio-1002, ¶ 1; ¶ 23. *Marcum* does not permit appellate courts to independently weigh the sentencing factors in R.C. 2929.12 on review. *State v. Davis*, 2016-Ohio-7319, --- N.E.3d ---, ¶ 5 (7th Dist.), citing *State v. Ongert*, 8th Dist. No. 103208, 2016-Ohio-1543, ¶ 14. In other words, reversal or modification of a sentence in the wake of *Marcum*, "applies to situations in which not one sentencing factor supports a stated prison term or the trial court erroneously relied on factors that did not exist." *Davis* at ¶ 5, quoting *Ongert* at ¶ 13.

**{¶58}** Here, the trial court was not required to make any findings under the

statutes referenced by R.C. 2953.08(G). Therefore, Gibson's sentence may be overturned only if that sentence was contrary to law or we clearly and convincingly determine that the record does not support the sentence. *Marcum* at ¶ 23.

**{¶59}** The trial court specifically concluded that Gibson's crime was more serious because, among other reasons, it "was certainly facilitated by the prior relationship with the victim." R.C. 2929.12(B)(6). Though not required to do so, the trial court further explained its reasons for deciding that Gibson was not amenable to community control even though he was a first-time offender and the PSI report recommended community control. These reasons included the fact that "* * * the testimony showed that there was, number one, illegal activity going on at the time that put the defendant in the place where he was, that the burglary was calculated and planned, that it was based upon intimidation* * *."

**{¶60}** Nor is Gibson's sentence otherwise contrary to law. "A trial court's sentence would be contrary to law if, for example, it were outside the statutory range, in contravention to a statute, or decided pursuant to an unconstitutional statute." *State v. Wolters*, 7th Dist. No. 14 NO 417, 2014-Ohio-5515, ¶ 9. Gibson was found guilty of a second-degree felony, which carries with it a prison term range of two to eight years. *See* R.C. 2911.12(A)(1), R.C. 2929.14(A)(2). Gibson was sentenced to three years, within the permitted range. He was afforded his allocution rights. Crim.R. 32(A)(1). The trial court properly imposed post-release control and jail-time credit, and considered the principles and purposes of felony sentencing and the sentencing factors. R.C. 2929.11 and R.C. 2929.12.

**{¶61}** Thus, the sentence is not clearly and convincingly unsupported by the record; nor is the sentence otherwise contrary to law. Therefore, Gibson's third assignment of error is meritless.

### Conclusion

**{¶62}** In sum, the trial court did not abuse its discretion by admitting Gibson's jail-house calls into evidence. Gibson's burglary conviction is not against the manifest weight of the evidence and the sentence imposed by the trial court was proper.

Accordingly, the judgment of the trial court is affirmed.

Donofrio, P. J., concurs.

Waite, J., concurs.